**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Mitchell Edwin HEAD, Defendant-Appellee.**

**No. 85–5032.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1985.

Decided March 4, 1986.

Pat Swan, Asst. U.S. Atty., argued; Peter K. Nunez, U.S. Atty., Pat Swan, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellant.

Frank T. Vecchione, San Diego, Cal., for defendant-appellee.

Before BROWNING, WIGGINS and BRUNETTI, Circuit Judges.

WIGGINS, Circuit Judge:

Head was indicted for attempted manufacture of methamphetamine (Count I), attempted possession of amphetamines with intent to distribute (Count II), and certain other charges that are not pertinent to the present appeal. The district court granted his motion to suppress evidence of chemicals and other objects seized by an agent of the Drug Enforcement Administration under authority of 21 U.S.C. § 881(a)(2).[1] The United States appeals the suppression order. 18 U.S.C. § 3731. We therefore restrict ourselves to the government's claim, on appeal, that the suppression was erroneous and that there was sufficient legal cause for the seizure under section 881(a)(2). In doing so, we address two main issues. The first issue is whether probable cause existed to justify the search of Head's vehicle without a warrant. *California v. Carney,* —— U.S. ——, 105 S.Ct. 2066, 2068–71, 85 L.Ed.2d 406 (1985). The government contends that there was probable cause to search Head's vehicle and that his rights under the Fourth Amendment were therefore not violated. Head raises the second issue in his defense of the suppression order. He contends that even if probable cause existed, evidence gained as the result of the search must nevertheless be suppressed because it was tainted by his unlawful detention or arrest.

The critical facts necessary to resolve these issues are not in dispute and our standard of review under the circumstances is *de novo. United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975).

## FACTS

On October 11, 1984, DEA Agent D'Ulisse, an agent with nearly 15 years' investi-

---

**1.** 21 U.S.C. § 881(a)(2) states:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

· · · · ·

(2) All raw materials, products, and equipment of any kind which are used or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting any controlled substance in violation of this subchapter.

gative experience, and with substantial experience with illicit drug laboratories, was working with Agent Torres, a California narcotics officer, in surveillance of RJM Laboratories in Santee, California. D'Ulisse knew that the owner of RJM had been convicted of operating a clandestine laboratory in Los Angeles in 1978. He also knew that investigation had disclosed that RLM was one of the largest producers of ephedrine in the southwestern states and that it had sold substantial amounts of ephedrine to laboratories that were producing illicit methamphetamine. D'Ulisse knew that ephedrine which, although it is not a controlled substance and can be bought over the counter, is used widely as a precursor of illicit methamphetamine. Other precursors are more expensive, are controlled, and are therefore more difficult to obtain. In his experience, possession of any large amount of ephedrine, by anyone other than a manufacturer of nasal decongestants, was very suspicious. There were no manufacturers of ephedrine-type decongestants in the immediate area.

As the agents approached RJM, they saw two men loading boxes into a late model Chevrolet Suburban (hereafter "The van" or "the vehicle")[2] parked in front of the laboratory. In the past D'Ulisse had been successful in following purchasers of RJM chemicals to illicit laboratories. The officers decided to follow the van. As it pulled away from RJM the officers noticed a sticker on it stating that it was a state emergency vehicle, but it had no official State license plates, insignia, or emergency lights.

The agents had no intent to stop the vehicle and, indeed, they did not stop it. Appellee Head, who had been driving the van, parked in a public parking lot in front of a 7–Eleven store and entered the store. The officers parked a few parking spaces away and got out of their car. When Head emerged from the store they met him as he walked toward the van. They identified

themselves, asked if he would answer some questions, and he did not object. They asked what he had in the van and he said that he had ether and acetone which he planned to use in experimenting with butyrophenomes. D'Ulisse (whose credentials permitted him to testify on the subject) said that this was suspicious because, in view of the chemical structure of ether and butyrophenomes, their use together was "ridiculous." Head then disclosed that he was aware of RJM's difficulty with the DEA. He asked if that was why the agents were questioning him; they said it was not. They then asked Head if he was employed by the state and he said that he was not, but that he put the sticker on his van because he occasionally did free-lance work cleaning up hazardous waste spills. He was requested to produce official State identification and he was unable to do so.

D'Ulisse asked to see Head's driver's license. He obtained it from the van and gave it to the officer. It indicated that Head lived near San Luis Obispo, some 250 miles away. Head stated that he was visiting his girl friend who lived in Ramona and thus it was convenient for him to buy the chemicals at RJM. He could not, however, remember the address or phone number of his girl friend. D'Ulisse then asked Head if he had any ephedrine in the vehicle and Head denied it.

The windows of Head's van were coated with some substance which darkened the glass making it difficult, but not impossible, to see into the interior. To a casual observer, objects within the van could be identified only by their general outline or shape. However, notwithstanding the coating material on the windows, it was possible for the officer to view the interior by placing his face against the glass, and cupping his hands around his eyes so as to exclude the glare from exterior lights. This is the manner in which Agent D'Ulisse looked through the window and into the interior of the van.

**2.** The Suburban is a hatch-back type vehicle with a rear passenger seat that may be removed to provide a flat bed to provide additional cargo space. Throughout the record it is referred to as a "van" and we will hereafter so refer to it.

When he did so, he saw a box marked "L–Ephedrine" and, from past experience, estimated it to be a five-pound box, or an amount capable of producing from 90,000 to 180,000 doses when used for decongestants. He saw no label indicating usage for human consumption. Again D'Ulisse asked Head if he had any ephedrine in the van. Because of his observations, he concluded that Head was lying when Head again denied having any ephedrine. D'Ulisse then called an assistant U.S. Attorney, who advised him not to arrest Head, but to seize the chemicals.

At this point, the officers opened the door to the van, over Head's objection, and seized two five-pound boxes of ephedrine. They also noticed a nylon bag, felt something hard, and opened it to see if other chemicals or weapons were present. They found a paper bag inside with nearly $39,-000 in it, stacked one face up, one face down, etc., in a manner known by D'Ulisse to be commonly used by drug traffickers. Another bag contained $8,000 and two guns. D'Ulisse again called the the assistant U.S. Attorney, who continued to advise D'Ulisse not to arrest Head but merely to seize the chemicals. Head was not arrested at that time, but later in the day he was arrested by state authorities for possession of a concealed weapon. At some later date he was indicted on the federal charges.

## DISCUSSION

The government's position on appeal is straightforward: the trial court erred in suppressing the drugs because their seizure was supported by probable cause and hence was lawful. Head defends the trial court's suppression order by advancing two principal arguments: (1) The seizure was illegal because it was the product of his illegal arrest; and (2) the seizure of the drugs was the consequence of an illegal search. In particular, he contends that the viewing of the drugs through the window of his van was itself an illegal search and information procured as a result of that search cannot provide justification for a warrantless entry into the van.

We discuss Head's contentions first. After doing so, our decision with respect to the government's position will be evident.

### 1. *The Legality of Head's Detention.*

Not every encounter between a police officer and a citizen involves a constitutional question. The Constitution only forbids unreasonable searches and seizures. Not every encounter is a seizure; and not every seizure is unreasonable.

■ Here, we regard the initial conversation between the officers and Head in the parking lot of the 7–Eleven store to be just that—a consensual conversation that Head could have terminated with impunity at any time. It was not a seizure in the constitutional sense or as a matter of common sense.

The information which Head volunteered during that conversation, however, had legal significance. It added to the already considerable fund of knowledge possessed by the agents. Most particularly, it permitted them to gain a reasonable suspicion, grounded in specific and articulable facts, that Head had no legitimate business purpose in picking up drugs from RJM Laboratories. It created the very kind of suspicious circumstance that prudent officers should investigate further and which is condoned by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889 (1968).

■ We conclude that before the officers detained Head and thereafter inspected the interior of the van, or entered it, the officers had sufficient founded suspicion, under *Terry,* to detain Head against his will for a brief period so as to allay or confirm their reasonable suspicions. At this point, however, they did not have probable cause to search the van.

■ The detention of a suspect under *Terry v. Ohio* is a Fourth Amendment seizure of the suspect's person, *id.* at 16, 88 S.Ct. at 1877, but does not involve all of the liberty restraints incidental to an arrest. The suspect is not incarcerated; he is detained briefly. His liberty is not restrained for all purposes; rather his freedom of

movement is restricted only to the extent necessary to permit officers to conduct a preliminary investigation of suspicious circumstances. Such a limitation upon one's liberty is lawful and evidence obtained during a *Terry* investigation is likewise lawful. *Id.* at 30, 88 S.Ct. at 1884. Here, the officers requested and received Head's driver's license. We hold that it was proper for them to do so so as to identify their suspect. The officers also asked the suspect whether he possessed ephedrine, in his vehicle. After the suspect denied possessing the drug, the officers looked into the interior of the van through the darkened window.

Appellee's reliance on *Brown v. Texas,* 443 U.S. 47, 49, 99 S.Ct. 2637, 2639, 61 L.Ed.2d 357 (1979), is not persuasive. There the officers saw two men in a high crime area. They allowed one to leave but stopped the other and ordered him to identify himself and explain his presence, merely because he "looked suspicious" and had not been observed in the area before. Brown was clearly not in a position to leave if he wished to. He refused to identify himself and disputed the right of the officers to stop him. He was then frisked and arrested for violating a Texas statute that prohibited refusal to identify oneself when lawfully stopped and requested to do so. The facts here are significantly different.

Before we consider whether the viewing of the evidence through the window was an illegal search, it is evident that the search, lawful or not, was not the product of an illegal detention. At the moment the officers inspected the interior of the van, Head was being lawfully detained pursuant to *Terry.* Looking into the window of his van is not inconsistent with the duty of an investigating officer holding a person temporarily on founded suspicion. Accordingly, we reject Head's contention that the evidence ultimately seized within his van was the product of an illegal arrest.

## 2. *Probable Cause for the Search.*

Head's argument that looking through the window of his van was an unlawful search compels us to examine relevant Fourth Amendment authority involving police officers who have inspected the interior of structures and vehicles they could not physically enter without a warrant. Because these cases will, in different factual settings, test the reasonableness of one's expectation of privacy, it is important to emphasize the factual setting here.

The Suburban is, in effect, private commercial premises to which the public generally was not invited. It was parked in a public place. It was reasonable to expect members of the public to pass within inches of the van and its windows. The windows themselves were coated with a material which made viewing from the exterior difficult, but not impossible, without placing one's face against the window and blocking the outside light with both hands. It is quite clear that the contents of the van were not visible to a casual passerby, but were visible to an inquisitive police officer pursuing founded suspicion. It is not unreasonable to believe that Mr. Head was quite well aware of this vulnerability to his privacy.

The critical question before us is the propriety of the agents' conduct in inspecting the interior of the van by pearing through the van's window. The test is whether Head had an expectation of privacy, and could justifiably and reasonably rely on that expectation of privacy being respected when he put the ephedrine and the other objects in the van. *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). Unless there was that reasonable expectation, there was no search for Fourth Amendment purposes. We have held that a police officer, who is in a place where he has a right to be, is not conducting a search when he looks through car windows. *United States v. Orozco,* 590 F.2d 789, 792 (9th Cir.1979), *cert. denied,* prior to filing of amended opinion 439 U.S. 1049, 99 S.Ct. 728, 58 L.Ed.2d 759 (1978). Citing *Katz,* this court stated in *Orozco:*

The deputies' looking through the windows of a vehicle parked on a public

street did not violate appellant's reasonable expectations of privacy; anyone walking past the vehicle could easily have observed the packages of cocaine and heroin.

This is consistent with *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983):

> There is no legitimate expectation of privacy, *Katz v. United States* ... shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.

*See also United States v. Finch,* 679 F.2d 1083, 1085 (4th Cir.1982) (no search to look into windows of camper parked in motel parking lot); *People v. Rogers,* 21 Cal.3d 542, 146 Cal.Rptr. 732, 579 P.2d 1048 (1978) (no search to view interior of van parked in municipal parking lot); *United States v. Coplen,* 541 F.2d 211, 214–15 (9th Cir.1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (1979) (no search to view interior of aircraft standing in public place). The rule has also been extended to views into residences and businesses by people standing in public places. *United States v. Hersh,* 464 F.2d 228, 230 (9th Cir.), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972) (no search to peer into window alongside front door); *United States v. Martin,* 509 F.2d 1211, 1214 (9th Cir.), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975) (officers with neighbor's consent viewing interior of defendant's residence from neighbor's yard did no more than the neighbors might have done); *Ponce v. Craven,* 409 F.2d 621, 625 (9th Cir.1969), *cert. denied,* 397 U.S. 1012, 90 S.Ct. 1241, 25 L.Ed.2d 424 (1970) (no search to view through partially open motel window); *United States v. Ortiz,* 603 F.2d 76, 79 (9th Cir.1979), *cert. denied,* 444 U.S. 1020, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980) (no search to view into gas station); *United States v. Wright,* 449 F.2d 1355, 1361 (per curiam) (D.C.Cir.1971), *cert. denied,* 405 U.S. 947, 92 S.Ct. 986, 30 L.Ed.2d 817 (1972) (no search to view into garage); *United States v. Groomer,* 596 F.2d 356, 357–58 (9th Cir.1979) (no search to view into airplane hangar).

In the cases cited there was no suggestion that the observer did any act in order to increase visibility, *e.g.,* no one pushed aside bushes, or curtains or shades, or removed shutters, or scraped through any covering on the window. The observations were made in the conditions created by or allowed by the owners or residents. Similarly, in the case at hand, Agent D'Ulisse did not disturb the van or the van window, he merely leaned closer to the window, which was darkened, shaded his eyes, and looked into it. He did not touch the van or the window, except to rest his hands as he shaded his eyes. This act alone did not convert his view into a search. *See Texas v. Brown,* 460 U.S. at 740, 103 S.Ct. at 1542 (officer changed his position by bending down to obtain a better view of the car's interior). D'Ulisse's action in shading his eyes was less intrusive than the use of an artificial means to illuminate the interior of premises, which courts have condoned. *United States v. Wright, supra,* (flashlight used to peer through a 9-inch gap in garage doors); *United States v. Coplen, supra,* (flashlight used to illuminate interior of an aircraft); *United States v. Hernandez,* 715 F.2d 548, 550 (11th Cir.1983) (per curiam), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 237 (1984) (spotlight used to illuminate boat deck during nighttime). A decision of the U.S. Supreme Court also approved the use of lights to illuminate the deck of a boat in nighttime. *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed.2d 1202 (1927). *Lee* was decided several years before *Katz,* and thus did not rely on the expectation of privacy test. However, *Lee* was cited in *Katz* for the proposition that "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."

■ We have no doubt that Head intended to gain some measure of privacy by applying an artificial surface to the windows which made viewing from its exterior difficult. Although he might have prevent-

ed all viewing by the installation of curtains, or other materials, he chose not to do so and thereby risked his privacy. He knew, or must have known, that the contents of the van were to some extent exposed to view and he accepted that risk. In reaching our conclusion, we are mindful that the nature of a privacy interest in some areas of a vehicle operated on a public highway is necessarily diminished. Vehicles are pervasively regulated and subject to appropriate safety inspections. They may be stopped for purposes related to safety and given limited inspections consistent with that purpose, for reasons falling short of probable cause. *California v. Carney*, 105 S.Ct. at 2069–70. Under such circumstances, there are "reduced expectations of privacy," *id.*, at least in the open interior areas of a vehicle which are not customarily used for sleeping purposes. All of these factors cause us to reject Head's contention that the viewing of the interior of his van was itself an unconstitutional search.

■ Although the viewing itself was not a search, it most certainly provided additional cause for the physical entry into the van which followed. We hold that the officers' determination, as the result of their visual inspection, that the van probably contained a drug commonly used in the manufacture of methamphetamines, when added to their existing suspicions and Head's untruthfulness, constituted probable cause to open the van to inspect its interior and to seize the chemicals and the other items of contraband found therein.

We reverse the trial court's order suppressing the evidence taken from the van, and remand for further proceedings consistent with this disposition.