825 F.2d 772
 Joseph Mario TARANTINO, Plaintiff-Appellee,
v.
B.R. BAKER, Jr., Detective, Avery Co. Sheriff's Department,
Defendant-Appellant,
and
State of North Carolina; James T. Rusher, District Attorney
for Avery County, North Carolina, individually and
in their official capacities, Defendants.
 No. 86-2109.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1987.
Decided Aug. 10, 1987.
 
 William Alfred Blancato, Winston-Salem, N.C. (Allan R. Gitter, Womble, Carlyle, Sandridge & Rice, on brief), for defendant-appellant.
 Thomas Franklin Loflin, III Durham, N.C. (Dean A. Shangler, Loflin & Loflin, David S. Rudolf, Chapel Hill, N.C., Beskind & Rudolf, on brief), for plaintiff-appellee.
 Before WIDENER and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Western District of North Carolina denying a police officer's claim of qualified immunity from suit under 42 U.S.C. Sec. 1983. The district court concluded that the officer's conduct violated clearly settled fourth amendment principles and denied his motion for summary judgment based on qualified immunity, 639 F.Supp. 661. We express no view on the constitutionality of the officer's conduct, an issue considered and decided against the officer's position in an earlier unappealed criminal suppression hearing. We disagree with the district court's conclusion, however, that the fourth amendment principles the officer allegedly violated were clearly settled at the time he acted. Accordingly, we conclude that the officer is entitled to qualified immunity, reverse the decision of the district court and remand for entry of summary judgment in favor of the officer.
 
 
 2
 * Appellant B.R. Baker, Jr., is a detective in the Avery County, North Carolina Sheriff's Department. On August 30, 1985, Baker received an anonymous telephone call reporting marijuana plants growing inside a former general store in rural Avery County. The caller reported that the plants were visible through cracks in the back wall of the building.
 
 
 3
 Baker did not immediately obtain a search warrant because he could not verify the reliability of his anonymous informant. He did, however, proceed to the building to question anyone who might be there, and to determine if anything in plain view could confirm the anonymous tip. When Baker arrived at the building, at approximately 10:00 p.m. that same evening, he found boarded-up windows and a padlocked front door. He walked around to the back porch of the building and knocked. He received no response. He then noticed, as the caller had reported, that a crack ran along the back wall roughly three feet above the level of the porch floor. When Baker shined his flashlight through the crack, he saw what appeared to be marijuana plants inside the building.
 
 
 4
 Baker did not immediately enter the building. Instead, he went to a magistrate who, relying on Baker's observations, issued a search warrant. When Baker returned to the building and executed the search warrant he seized a number of marijuana plants as well as paraphernalia used to grow marijuana.
 
 
 5
 Criminal charges were subsequently brought against the building's occupant, appellee Joseph Mario Tarantino, in the United States District Court for the Western District of North Carolina. The district court, however, suppressed the evidence obtained by Baker, concluding that he had invaded Tarantino's "zone of expected privacy" when he looked through the crack hoping to confirm the informant's tip. The government chose not to appeal the district court's suppression ruling and dropped the prosecution.
 
 
 6
 Tarantino then filed a complaint in United States District Court for the Western District of North Carolina naming various state officials as defendants and seeking, inter alia, a permanent injunction against the use of the items Baker seized in any subsequent state criminal prosecution. After the district court refused to issue a temporary restraining order, Tarantino amended his complaint to seek money damages from Baker for violating his constitutional rights under color of law, 42 U.S.C. Sec. 1983. Tarantino also added a pendent state trespass claim against Baker.
 
 
 7
 On defendants' motions the district court dismissed all of the claims except Tarantino's Sec. 1983 claim against Baker in his individual capacity and the pendent state trespass claim. The district court rejected Baker's argument that he was entitled to a dismissal or summary judgment based on qualified immunity because the district court could not "conclude as a matter of law based on the materials [presented] that Baker's actions did not violate 'clearly established law.' " Baker here appeals the district court's denial of his motion for summary judgment.[1] This appeal focuses exclusively on the district court's rejection of Baker's qualified immunity defense.
 
 II
 
 8
 In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Emphasis added.) This principle, as most recently reaffirmed and applied by the Court in Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), reflects the concern that civil damages awards against public officers for every judicially determined violation of constitutional rights would prove too expensive to the public, discourage public service employment and impair governmental decisionmaking. Id. 107 S.Ct. at 3038. It also reflects a recognition that there are other disincentives--including the suppression of evidence in criminal prosecutions--impelling government officials to avoid illegal conduct. The qualified immunity principle seeks to strike the proper balance between the encouragement of respect for legal rights and the discouragement of initiative simultaneously posed for officials by the threat of civil damages. Id. at 3037-40. As the Supreme Court noted in Harlow:
 
 
 9
 Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."
 
 
 10
 457 U.S. at 819, 102 S.Ct. at 2739 (quoting Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)). Some limited protection of government officials from the civil liability made possible by Sec. 1983 is therefore essential.
 
 
 11
 The protection of qualified immunity extends to police officers, Pierson, 386 U.S. at 557, 87 S.Ct. at 1219, providing them with a margin for error when they navigate uncharted areas at the margins of constitutional criminal law. Even when a court concludes after the fact that a police officer violated a constitutional right, the officer remains shielded from civil liability under Sec. 1983 unless the right was "clearly established" at the time he acted and he reasonably should have known that his actions were illegal. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (finding a fourth amendment violation for a warrantless search but also finding qualified immunity for the Attorney General in ordering the search). As the Fifth Circuit has noted:
 
 
 12
 Police officers can be expected to have a modicum of knowledge regarding the fundamental rights of citizens. Lawlessness will not be allowed to pervade our constabularies. However, in holding our law enforcement personnel to an objective standard of behavior, our judgment must be tempered with reason. If we are to measure official action against an objective standard, it must be a standard which speaks to what a reasonable officer should or should not know about the law he is enforcing and the methodology of effecting its enforcement. Certainly we cannot expect police officers to carry surveying equipment and a Decennial Digest on patrol; they cannot be held to a title-searcher's knowledge of metes and bounds or a legal scholar's expertise in constitutional law.
 
 
 13
 Saldana v. Garza, 684 F.2d 1159, 1165 (5th Cir.1982).
 
 
 14
 When a police officer asserts qualified immunity, the legal inquiry often focuses not so much on the "clarity" of the right allegedly violated as on whether the officer's actions "clearly" infringed that right. This may be particularly true when, as here, the civil suit is premised on a violation of the fourth amendment. The "meaning" of the fourth amendment, at least when stated in broad philosophical terms, is relatively clear. The precise action or combination of actions, however, which will infringe a particular suspect's fourth amendment rights is often difficult for even the constitutional scholar to discern because the legal doctrine has developed and continues to develop incrementally. Although some actions by a police officer must be held to violate "clearly settled" fourth amendment law even if no other reported case involves identical circumstances, there is often a "legitimate question" whether an officer's particular conduct constituted an improper search or seizure. See Anderson, 107 S.Ct. at 3039; Mitchell, 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12. When such a "legitimate question" exists, the principle of qualified immunity gives police officers the necessary latitude to pursue their investigations without having to anticipate, on the pain of civil liability, future refinements or clarifications of constitutional law.
 
 III
 
 15
 In rejecting Baker's claim of qualified immunity, the district court necessarily concluded that Baker's actions, as alleged in Tarantino's complaint, "clearly" constituted an illegal warrantless search.[2] We disagree.
 
 
 16
 Not all glances by a police officer, even those consciously directed at uncovering evidence of crime, constitute "searches" in fourth amendment terms. A "search," rather, "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). As the Supreme Court pointed out in Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983):
 
 
 17
 The Fourth Amendment protects legitimate expectations of privacy rather than simply places. If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no "search" subject to the Warrant Clause.... The threshold question, then, is whether an individual has a legitimate expectation of privacy [in the area inspected].
 
 
 18
 The "threshold question" identified in Andreas is the focus of Baker's claim of qualified immunity. Unless Tarantino had a "reasonable expectation of privacy" in the interior of his marijuana storage facility which was clear as a matter of law, Baker cannot be liable for damages for looking inside without a warrant.
 
 
 19
 Few issues are more vexed than the meaning in particular situations of a "reasonable expectation of privacy." Originating in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the concept embodies an effort to divorce the fourth amendment "search" from common-law notions of technical trespass--to emphasize the amendment's protection of "rights rather than places.". As applied, "reasonableness" relates both to the expectation allegedly had by the owner or occupant of an area searched and to that person's objective manifestations to potential searchers that he has such an expectation. See Katz, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Predictably, particular judicial assessments of alleged "reasonable expectations of privacy" have been tied to their facts and have produced only general principles.
 
 
 20
 In United States v. Head, 783 F.2d 1422, 1426 (9th Cir.1986), the Ninth Circuit surveyed the case law on alleged illegal searches where "police officers ... have inspected the interior of structures and vehicles they could not physically enter without a warrant." Relying on its survey, the court found no illegal "search" where a police officer cupped his hands to peer through the coated window of the defendant's van, even though the reflective coating made it "difficult but not impossible, to see into the interior" and even though, to a casual observer, "objects within the van could be identified only by their general outline or shape." 783 F.2d at 1424. The court cited with approval a number of cases finding no fourth amendment search when a police officer, standing where he had a right to be, looked through a window or opening into a private space and made observations "in the conditions created by or allowed by the owners or residents." 783 F.2d at 1427. As the court concluded:
 
 
 21
 We have no doubt that Head intended to gain some measure of privacy by applying an artificial surface to the windows which made viewing from its exterior difficult. Although he might have prevented all viewing by the installation of curtains, or other materials, he chose not to do so and thereby risked his privacy. He knew, or must have known, that the contents of the van were to some extent exposed to view and he accepted that risk.
 
 
 22
 783 F.2d at 1427-28.
 
 
 23
 The general principle of Head, that a person has no "reasonable expectation of privacy" when he leaves conditions permitting a curious passerby to invade his "private space," traces its roots to Katz itself. See Katz, 389 U.S. at 351, 88 S.Ct. at 511 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of fourth amendment protection."). This principle received perhaps its most extreme expression in a case strikingly similar in several respects to the instant case, United States v. Wright, 449 F.2d 1355 (D.C.Cir.1971). In Wright, the D.C. Circuit decided that the defendant's actions in storing a stolen auto transmission in a garage were not calculated "to keep his possession of it 'strictly private and free from perception of others,' " 449 F.2d at 1364, even though investigating officers were forced to lie in front of the closed garage doors and shine a flashlight through a narrow opening in order to detect it.
 
 
 24
 Taken to an extreme, this mode of analysis, especially that in Wright, might suggest that the fourth amendment provides no protection from a "search" so long as one leaves the minutest crack in the means chosen to protect his privacy. Such a principle is both unpalatable and inconsistent with the specific holding of Katz. Given cases like Head and Wright, however, and the uneven judicial explications of the general concept of "reasonable expectation of privacy," we simply cannot conclude that Baker's conduct contravened any "clearly settled" fourth amendment principles when that conduct is tested under the Harlow standard.
 
 
 25
 In arguing that Baker's actions clearly constituted an illegal "search" as a matter of settled law, Tarantino relies principally on this court's decision in United States v. Bradshaw, 490 F.2d 1097 (4th Cir.1974). In Bradshaw, police officers entered the property of a suspected moonshiner to inquire about an apparently abandoned vehicle beyond his property line. As one of the officers approached close to the residence, he peered into a crack in the closed doors of a parked truck and observed what appeared to be jugs of moonshine whiskey. Without obtaining a warrant, the officer then entered the truck and seized the jugs.
 
 
 26
 This circuit held that the evidence seized by the officer should have been suppressed because it was obtained in violation of the Warrant Clause. Although the court conceded that the officer was present on the defendant's property for a legitimate purpose, it concluded that the search and seizure were illegal because the officer had exceeded the original purpose of his intrusion. As the court noted, the truck was parked on the defendant's property alongside his home. Under such circumstances, the defendant had a reasonable expectation that the contents of his truck "would remain unknown to the general public." 490 F.2d at 1101. Noting that the contents of the truck "could not have been detected by the casual glance of a passer-by," 490 F.2d at 1099, and that there was no independent justification for the officer's inspection of the truck, the court held the warrantless search and seizure illegal.
 
 
 27
 In rejecting Baker's motion for summary judgment, the district court cited Bradshaw for the proposition that because Baker's discovery of the marijuana was not "inadvertent," his "search" did not fall within the "plain-view doctrine."[3] The "plain-view doctrine," however, with or without an "inadvertence requirement," is not implicated by Baker's actions since he did not seize any items until after he obtained a search warrant.
 
 
 28
 We should emphasize, as a critical aspect of its "unsettled" state, that fourth amendment case law often uses, and sometimes confuses, two meanings of the term "plain view." Baker's asserted defense of his actions involves the simplest generic use of the term: he contends that since the contents of the building were open to the "plain view" of any curious citizen who, like Baker, wanted to stand on the porch of a nonresidential building and look through cracks in the wall, Tarantino manifested no "reasonable expectation of privacy" in the building's interior. Bradshaw, in contrast, implicated the "plain-view doctrine" as it related to warrantless seizures. As the Supreme Court explained in Andreas:
 
 
 29
 The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity.... The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.
 
 
 30
 463 U.S. at 771, 103 S.Ct. at 3324.
 
 
 31
 In Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), a plurality of the Supreme Court decided that the plain-view exception to the requirement of a warrant before seizure required that the seizure be "inadvertent." The rationale of the plain-view doctrine, as the Court noted, is that
 
 
 32
 a plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as "per se unreasonable" in the absence of exigent circumstances.
 
 
 33
 403 U.S. at 470-71, 91 S.Ct. at 2040.
 
 
 34
 In Bradshaw, this circuit invalidated a warrantless seizure of evidence when the officer's inspection of the defendant's truck exceeded the limited justification for his presence on the defendant's property. Tarantino cannot, however, extend Bradshaw and cases from this circuit explicitly applying Coolidge to prove that Baker's actions clearly constituted an illegal search merely because he already expected to find marijuana in the building--i.e., that his inspection was not inadvertent. Such reasoning would convert every police officer's gaze into a search as long as the officer hoped or expected to detect incriminating evidence. Baker did not seize the marijuana until he obtained a warrant and the character of Baker's inspection as a "search" depends wholly on the determination whether his actions violated Tarantino's reasonable expectation of privacy. The inadvertence requirement articulated in Coolidge, in other words, simply does not apply beyond warrantless seizures following a prior physical intrusion into a constitutionally protected "private" area. See LaFave, Search and Seizure (1978 ed.) pp. 242-43; see also United States v. Dunn, --- U.S. ----, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (finding no prior physical intrusion into a constitutionally protected "open fields" area and thus no "search" despite an obviously "advertent" inspection of a barn's interior).
 
 
 35
 Tarantino, apparently recognizing on appeal that Baker's motivations for looking into the building are irrelevant, shifts our attention to another and more obviously relevant aspect of Bradshaw: the court's conclusion that the officer there actually invaded a "zone of privacy" when he looked into the parked truck. This conclusion, however, does not establish a controlling definition of "reasonable expectation of privacy" in this circuit which we are prepared simply to superimpose on the different circumstances of this case.
 
 
 36
 While the circumstances bearing on the manifestation of privacy in Bradshaw can be distinguished from those here in various ways, the most obvious distinction is the position of the respective officers at the moment of their alleged "searches." In Bradshaw, the "search" occurred within the curtilage of the defendant's residence. The "expectation of privacy" in close proximity to a residence is presumptively heightened because of the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). While the owner or occupant of a commercial building may also manifest a reasonable expectation of privacy, his privacy interest is presumptively less. As Justice Brennan has observed:
 
 
 37
 For a homeowner to preserve Fourth Amendment protection in the area immediately surrounding the residence, he or she must not conduct an activity or leave an item in the plain view of those outside that area. The occupant of a commercial building must take the additional step of affirmatively barring the public from the area because a business operator has a reasonable expectation of privacy only in those areas from which the public has been excluded.
 
 
 38
 Dunn, 107 S.Ct. at 1147 (Brennan, J., dissenting) (emphasis in original).
 
 
 39
 This distinction is critical to Tarantino's reliance on Bradshaw to show that he clearly enjoyed a "reasonable expectation of privacy." He has never alleged that the building Baker inspected was a residence, or that Baker had no right, shared by the general public, to approach the building by way of its back porch. As this circuit has recognized, Bradshaw 's holding simply cannot be transferred indiscriminately to cases where the location of the alleged search lies beyond the curtilage of a residence. See United States v. Bellina, 665 F.2d 1335, 1342-43 (4th Cir.1981).
 
 IV
 
 40
 In conclusion, we reemphasize that we have not been asked to provide, and will not offer, any assessment of the district court's conclusion in granting a suppression order, that Baker violated Tarantino's fourth amendment rights. Baker's actions certainly test the extremes to which a citizen must go to prevent police officers from "searching" with impunity through the cracks in his otherwise enclosed and private spheres. Given the unsettled and fact-specific nature of the precedents, however, and the absence of such unambiguous indicia of a violation of a reasonable expectation of privacy as, for example, intrusion into the curtilage of a residence, we cannot agree that Baker's actions violated a "clearly established" constitutional standard. He is entitled to qualified immunity. We accordingly reverse the district court's decision on Baker's motion for summary judgment. We also remand to the district court to decide whether the pendent state claim should be dismissed, noting that such claims should ordinarily be dismissed when the federal claim is dismissed before trial. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 1139-40, 16 L.Ed.2d 218 (1966); Reamer v. United States, 459 F.2d 709, 711 (4th Cir.1972).
 
 
 41
 REVERSED AND REMANDED.
 
 
 
 [1]
 An order rejecting a defendant's defense of qualified immunity from suit for damages under Sec. 1983 is immediately appealable "to the extent that it turns on an issue of law," under Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). The order here does so turn, see note 2, infra
 
 
 [2]
 "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2816. There is no dispute in this case concerning either Baker's actions or their motivations. We, like the district court, are therefore offered a straightforward question of law: whether the legal norm Baker allegedly violated was clearly established as to the particular actions taken at the time he acted. See Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816
 
 
 [3]
 Bradshaw held simply that the officer "did not discover the evidence until his intrusion had exceeded the bounds of his original justification for being present." 490 F.2d at 1101 n. 3. The court expressly avoided holding that the search was illegal because it was not "inadvertent" since, as the court observed, the "inadvertence requirement" from Coolidge v. New Hampshire, discussed below, had been endorsed only by the plurality opinion. The Supreme Court has still not decided authoritatively whether "inadvertence" is an element of the plain-view doctrine. See Arizona v. Hicks, --- U.S. ----, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987) (White, J., concurring). This circuit, however, perhaps influenced by the intimate relationship between the holding in Bradshaw and the rationale for an inadvertence requirement, has repeatedly recognized such a requirement. See, e.g., United States v. Fawole, 785 F.2d 1141 (4th Cir.1986)