Jules GASSNER, Plaintiff–Appellee,

v.

CITY OF GARLAND, TEXAS, et al., Defendants,

M.L. Bates, Defendant–Appellant.

No. 88–1225.

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1989.

Rehearing Denied March 7, 1989.

Gary Crapster, Mark Donheiser, Dallas, Tex., for defendant-appellant.

Douglas R. Larson, Dallas, Tex., for plaintiff-appellee.

Before WILLIAMS, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Plaintiff Jules Gassner filed suit under 42 U.S.C. § 1983 against the City of Garland, Texas, and M.L. Bates, a police officer employed by the city, alleging, *inter alia*, that Bates arrested him without probable cause and used excessive force in making the arrest, in violation of his rights under the fourth and fourteenth amendments and state law. The district court

dismissed the case as to the city, but denied Bates's motion for summary judgment on the ground that no reasonable police officer could have believed that there was probable cause to arrest Gassner for the offenses with which Gassner was charged.

## I.

We state the facts as alleged by the plaintiff in his deposition.[1]  On February 12, 1985, Gassner, his wife, Carol Gassner, and their eight-year-old son, Gregory, ate dinner at a restaurant located in a Garland, Texas, shopping center.  Gregory finished eating before his parents, and was permitted to wander off alone; some time later, Carol left the restaurant to attend a function at a nearby church.  Finally, some time after his wife left, Gassner paid the check, but was unable to locate his son.  After looking for him for approximately thirty minutes, Gassner decided to drive to the church to see whether, by some misunderstanding, Carol had taken Gregory with her.

When Gassner arrived at the church and found his wife, he learned that she had not taken Gregory with her.  At that point, the Gassners became, in Gassner's words, "concerned"; his wife he described as "super frantic."  Gassner, accompanied by his wife, got into his car and began to drive back to the shopping center.  By this time, it was approximately 7:30 p.m.; in Gassner's words, "it was full dark."

On the way to the shopping center, according to his testimony, Gassner did not exceed the legal speed limit; he did admit, however, that when he made a right turn on a red light, his vehicle left the pavement on the righthand side of the intersection and went onto the dirt shoulder, at which time the car "bounced" when one of the wheels hit a hole in the shoulder.  Shortly after making this right turn, Gassner saw the emergency lights of Officer Bates's police car behind him, and came to a quick stop on the side of the road.

Without waiting for the officer to approach, Gassner immediately exited his vehicle and began to walk "quickly"—he insists that he did not run—toward the police car, reaching the rear of his car before Bates was able to exit his squad car.  According to Gassner, he walked with his arms extended out in front of his body, the palms of his hands facing forward, with his sportcoat unbuttoned to show the officer that he was unarmed;[2] at the same time, he said, in a moderately loud voice, that he was glad to see the officer and that he needed his help.

Unfortunately, Gassner's actions did not elicit the desired response.  After observing Gassner quickly approach him in an unusual fashion, Officer Bates exited his vehicle, drew his service revolver, and ordered Gassner to "freeze" and raise his hands above his head.  After radioing for assistance, Bates approached Gassner and frisked him for weapons.  After finding that Gassner was unarmed, Bates put away his service revolver.

The conversation that thereafter occurred can best be described as confused.  The Gassners—Mrs. Gassner had by this time exited the car and joined the two men—both repeatedly attempted to inform Bates that they had lost their son at a nearby shopping center; Bates sought information as to who the Gassners were, where they lived, and where the shopping center was.  From Gassner's deposition, the most one can conclude is that the Gassners expected the officer to come with them immediately to the shopping center to aid them in their search for their son; Officer Bates, on the other hand, expected them to stay and answer his questions until he decided on a course of action.  From Bates's point of view, in other words, the

1. The record on summary judgment consists solely of the pleadings and Gassner's deposition.  Because we draw all inferences in the manner most favorable to the nonmoving party, *see Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986), it is appropriate to base our statement of the facts upon Gassner's deposition, upon which Bates himself relies in arguing that he is entitled to summary judgment.

2. According to Gassner, this was a "classic approach-a-police-officer pose" which he had learned during his training as a deputy marshal for the city of Dallas.

Gassners were under an implicit but unmistakable order to remain where they were until directed otherwise.

The upshot of all this was that, after three or four exchanges, Gassner, obviously frustrated by either Bates's failure to understand the couple's situation or his refusal to do as Gassner expected, told Bates:

> I'm going back up to that shopping center. You can get in your damn squad car and follow me up there, and we'll talk there.

As Gassner started to turn around to get into his car, Bates grabbed him by the shoulder and told him that the "only place you're going is to jail." In his own words, Gassner did not "cooperate" with Bates's attempt to push him against the back of Gassner's car; eventually, a scuffle ensued, which ended when Bates put Gassner in a chokehold, wrestled him to the ground, and handcuffed him.

After Gassner was handcuffed, other Garland police officers arrived and took Mrs. Gassner to the shopping center, where they found the Gassners' son. After placing Gassner in the back of his squad car, Bates also drove to the shopping center. On the way there, Gassner asked Bates why he had been arrested; Bates answered by saying that he had been arrested for "speeding," to which Gassner replied, "You dumb f——. That's the only thing you can't arrest me for."

After locating the Gassners' son, Bates took Gassner to the police station, where Gassner was charged with speeding and disorderly conduct. Later that night, he was released after signing the speeding ticket and posting bond on the disorderly conduct charge. Although he was prosecuted, the jury acquitted him on both charges.

## II.

Gassner then filed this action. The complaint stated numerous causes of action under both state and federal law; in essence, the federal causes of action were unlawful arrest and the use of excessive force.

After both defendants deposed Gassner, the city obtained a dismissal of Gassner's complaint as to it. However, the court denied Bates's motion for summary judgment, which was based upon qualified immunity, concluding that no reasonable officer could have believed that there was probable cause to arrest Gassner for the offenses with which he was charged, namely, speeding and disorderly conduct. Bates appeals the denial of his motion, pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

## III.

Once again, we are called upon to define the contours of the qualified immunity from suit enjoyed by police officers under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Harlow*, the court described the parameters of what has become known as *"Harlow* immunity" for state officials who are charged in civil actions with violating a plaintiff's constitutional rights. The court defined this form of qualified immunity as follows:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. at 2738.

In *Anderson*, the Court carefully considered the threshold which section 1983 plaintiffs must meet in order to overcome a claim of *Harlow* immunity:

> The operation of [the *Harlow*] standard ... depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.

Much the same could be said of any other constitutional or statutory violation. But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow.* . . .

107 S.Ct. at 3038–39. Hence, the Court offered the following refinement of the *Harlow* qualified immunity test:

[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.

*Id.* at 3039. This court has taken the teaching of *Anderson* to heart. *See Hodorowski v. Ray,* 844 F.2d 1210, 1216–17 (5th Cir.1988) (holding that a right to "family integrity," although certainly of "constitutional stature," was an unsuitable basis upon which to fix section 1983 liability in particularized circumstances).

Indeed, even our cases predating *Anderson*—and specifically those involving section 1983 claims based upon alleged unlawful arrests—anticipated, and were responsive to, the concerns expressed therein. In *Saldana v. Garza,* 684 F.2d 1159 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983), the plaintiff argued that, because there was no probable cause for his arrest on charges of "public intoxication" and "disorderly conduct by abusive language," and because both the elements of those crimes and the constitutional requirement of probable cause were "well-settled," the defendant police officers could not claim qualified immunity under *Harlow.* In essence, the plaintiff's argument boiled down to the simple proposition that a police officer who arrested someone on the erroneous—albeit reasonable or unreasonable—belief that probable cause supported the arrest could never claim qualified immunity. *See id.* at 1164.

We firmly rejected this argument, employing much of the same reasoning as would later be used by the Supreme Court in *Anderson:*

Police officers can be expected to have a modicum of knowledge regarding the fundamental rights of citizens. Lawlessness will not be allowed to pervade our constabularies. However, in holding our law enforcement personnel to an objective standard of behavior, our judgment must be tempered with reason. If we are to measure official action against an objective standard, it must be a standard which speaks to what a reasonable officer should or should not know about the law he is enforcing and the methodology of effecting its enforcement.

*Id.* at 1165. Thus, we held that the standard by which to judge a police officer's claim to qualified immunity must be neither too general nor too specific. An officer on the beat is not expected to have and apply the knowledge of a constitutional scholar, whose stock in trade is giving concrete application to lofty, abstract legal principles; nor is he expected to have the expertise in every field of the specialist, who, for example, could know with certainty whether a substance was or was not illegal, or whether a driver was or was not intoxicated. Rather, we ask only that he act in accordance with what a reasonable officer "should or should not know about the law he is enforcing." *Id.*

Shortly after *Saldana* was decided, we considered the question of how the qualified immunity standard should be applied when an officer seeks to justify an arrest by arguing that there was probable cause to arrest the plaintiff for an offense other than the one with which the plaintiff was later charged. In *Trejo v. Perez,* 693 F.2d 482 (5th Cir.1982), the plaintiff alleged that the defendant police officer lacked probable cause to arrest him for disorderly conduct, the offense with which he was charged. At trial, the defendant requested a jury instruction that would have allowed the jury to find that he had probable cause to arrest the plaintiff, not for disorderly conduct, but for violating a Texas statute that required a person to provide his name and

address to a peace officer who lawfully stopped him and requested the information.[3] The trial court refused to give the instruction because, *inter alia*, the offense was not the actual basis of the arrest.

We reversed, holding that the legality of an arrest may be established by proving that there was probable cause to believe that the plaintiff had committed a crime other than the one with which he was eventually charged, provided that the " ' "crime under which the arrest is made and [the] crime for which probable cause exists are in some fashion related." ' " *Id.* at 485 (quoting *United States v. Atkinson,* 450 F.2d 835, 838 (5th Cir.1971), *cert. denied,* 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972) (quoting *Mills v. Wainwright,* 415 F.2d 787 (5th Cir.1969))). Although we were wary of allowing police officers to justify what from the outset may have been actually sham or fraudulent arrests on the basis of *ex post facto* justifications that turn out to be valid, we were also wary of requiring officers to "overcharge" in the hope that at least one charge would stand up in a later criminal or civil proceeding. Requiring a nexus between the crime charged and the crime for which probable cause existed is a workable compromise between these competing concerns.

Moreover, in *Trejo* we emphasized that the inquiry was entirely objective. A police officer need not actually have had the crime for which probable cause existed in mind at the time of the arrest; rather, the question is "whether the conduct that served as the basis for the charge for which there was no probable cause could, in the eyes of a similarly situated reasonable officer, also have served as the basis for a charge for which there was probable cause." 693 F.2d at 486. We noted the congruence between this test for determining whether an arrest was legal and the test for qualified immunity laid out in *Harlow:* Both look to "whether a reasonable police officer would have had probable cause to believe an offense was being committed in his presence." *Id.*[4]

Although *Saldana* and *Trejo* predate *Anderson,* they are entirely consistent therewith and hence provide the appropriate basis upon which to resolve the instant case. To determine whether Bates is entitled to qualified immunity, we thus ask only whether a reasonable officer in Bates's position could have concluded that there was probable cause to believe that Gassner had committed either the offense with which he was charged or a related offense.

## IV.

In denying Bates's motion for summary judgment, the district court concluded that no reasonable officer could have determined that there was probable cause to arrest Gassner for either of the offenses—speeding and disorderly conduct—with which he was actually charged. Bates contends that, regardless of whether the district court's reasoning was correct, he was nonetheless entitled to summary judgment on qualified immunity grounds because a reasonable officer could have concluded that there was probable cause to arrest Gassner for the related offense of violating Tex.Rev.Civ.Stat.Ann. art. 6701d § 23(a), which makes it an offense for any person "willfully [to] fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to

---

3. In *Spring v. Caldwell,* 516 F.Supp. 1223 (S.D. Tex.1981), *rev'd on other grounds,* 692 F.2d 994 (5th Cir.1982), the statute, Tex. Penal Code Ann. § 38.02, was declared facially unconstitutional. Because the arrest took place in 1979, however, the unconstitutionality of the statute was not clearly established at the time of the arrest.

4. Applying this test, we concluded in *Trejo* that the requested instruction should have been given, because the conduct that formed the basis of the arrest for disorderly conduct—the use of vulgar language in a public place—also would have supported an arrest for a violation of § 38.02, insofar as Trejo's use of vulgar language was in response to a request for identification. *See* 693 F.2d at 486; *see also United States v. Hathorn,* 451 F.2d 1337, 1341 (5th Cir. 1971) (per curiam) (on petition for rehearing) (arrest for drunken driving validated because the defendant also could have been arrested for being drunk in a public place).

direct, control, or regulate traffic." [5]  We agree.[6]

### A.

■ Gassner contends on appeal that Bates lacked a basis for stopping his vehicle in the first place.  We disagree.[7]

When he pulled Gassner over, Bates indicated to Gassner that he did so because he saw Gassner make a right turn on a red light in an unusual manner.  In his deposition, Gassner stated that he had indeed turned right on red at an intersection by cutting across a dirt shoulder that had been "wallowed out" by previous cars making similar turns.  During the turn, Gassner stated that Bates apparently noticed him because during the turn his car "bounced" when it hit a hole in the dirt shoulder.

The facts as revealed by Gassner's own deposition indicate that Bates's actions in making an investigatory stop of Gassner's vehicle were reasonable.  In making the right turn, Gassner drove his car off the pavement and onto the dirt shoulder, an action that is undeniably unlawful under Texas law.  *See* Tex.Rev.Civ.Stat.Ann. art. 6701d §§ 13, 65(a).  Having seen Gassner perform this unlawful act, Bates was entitled to stop Gassner's vehicle.  *See, e.g.,*

*Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *Wells v. State,* 716 S.W.2d 715, 717 (Tex.App.—Corpus Christi 1986, no writ).[8]

### B.

■ We thus turn to the issue of the arrest itself.[9]  As we concluded above, for Bates to be entitled to qualified immunity for his arrest of Gassner, we must find (1) that a reasonable officer could have thought that there was probable cause to arrest Gassner for violating section 23 and (2) that section 23 and at least one of the offenses with which Gassner was actually charged are related.

We have little difficulty holding that a reasonable officer in Bates's position could have found probable cause to arrest Gassner.  Section 23 makes it a misdemeanor for any person to fail to follow the lawful order of a police officer who is enforcing the traffic laws of the state of Texas; section 153 in turn gives a police officer the authority to arrest without a warrant any person who violates section 23.  Having lawfully stopped Gassner for a traffic violation, Bates was surely entitled to require Gassner to stay at the scene for a reasonable period of time while Bates ascertained

---

**5.** Tex.Rev.Civ.Stat.Ann. art. 6701d § 153 in turn authorizes the warrantless arrest of any person found to be violating, *inter alia,* § 23(a).

**6.** Because we conclude that a reasonable officer could have found probable cause to arrest Gassner for violating § 23(a), we do not reach, and express no view upon, the issue of whether there was probable cause to arrest him for speeding and/or disorderly conduct.

**7.** We address this issue only insofar as Gassner bases any of his claims solely upon the initial stop or upon the totality of Bates's actions prior to the arrest.  To the extent that Gassner is arguing that, because the initial stop was invalid, his subsequent arrest is also invalid, we reject his assertion.  Although it is true that evidence gained pursuant to an unlawful stop cannot be used to establish probable cause for a subsequent arrest, *see, e.g., United States v. Beck,* 602 F.2d 726, 729–30 (5th Cir.1979), the fact that a person has been unlawfully stopped does not mean that he can actually commit a new crime in the officer's presence secure in the knowledge that the fact of the illegal stop has rendered him immune from arrest.

**8.** To the extent that Gassner challenges the legality of Bates's actions in drawing his weapon and frisking Gassner, we find Bates's actions justified under *Terry.*  In "full dark," Gassner, who had just been pulled over, quickly approached Bates in a highly unusual fashion before Bates could even get out of his squad car.  Even though Gassner was trying to show Bates that he was unarmed, Bates could reasonably interpret Gassner's actions as threatening, thus justifying the drawing of his weapon and a limited frisk of Gassner to ensure that he was unarmed.  *See Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.  We emphasize that the salient question is not what Gassner actually had in mind (which in fact was wholesome), but what a reasonable officer, ignorant of the child's disappearance, could have concluded from Gassner's mannerisms.

**9.** Both parties agree that, for fourth amendment purposes, the arrest occurred when Bates grabbed Gassner by the shoulder and told him that he was going to jail.  *See Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).

Gassner's name and address and other information relevant to the violation. Although we can perhaps understand his frustration with Bates's actions, Gassner, by both informing Bates that he was going to leave the scene and then actually beginning to leave the scene, failed to comply with Bates's initial order to pull over and Bates's implicit order not to leave the scene during the investigation.

A person who has been pulled over for committing a traffic violation, regardless of the circumstances surrounding the violation, simply does not have the right to leave the scene until the officer has completed an investigation that is reasonable under the circumstances.[10] In this case, Gassner attempted to leave even before Bates was able to get his name or his address, write up a ticket, or understand fully the couple's unfortunate situation regarding their lost son. Under these circumstances, a reasonable officer could have thought that Gassner's unilateral attempt to leave the scene was a violation of section 23 for which he could be arrested.

We also have little difficulty concluding that section 23 and disorderly conduct, one of the offenses for which Gassner was actually arrested, are related in that they arise from precisely the same conduct. The conduct forming the basis for the disorderly conduct charge—Gassner's command to Bates that he get into his "damn squad car" and follow him, and his attempt to leave the scene of the accident without permission—is precisely the same conduct that would have supported an arrest for a violation of section 23. Cf. *Trejo*, 693 F.2d at 486; *Hathorn*, 451 F.2d at 1341.

We thus hold that a reasonable officer in Bates's position would have had, on the basis of Gassner's conduct, probable cause to believe that Gassner was committing a crime related to that with which he was actually charged. Because Bates was therefore entitled to qualified immunity

from liability on Gassner's claim of unlawful arrest under federal law, the district court's denial of his motion for summary judgment was improper.

## V.

■ In the district court, Bates also moved for summary judgment as to Gassner's claim that he used excessive force in arresting Gassner. The court did not address the issue, presumably because it concluded that Bates was not entitled to qualified immunity as to the arrest itself. Having rejected this determination, we must therefore address the issue of excessive force.

On the facts as stated by Gassner's deposition, we hold that Bates is entitled to summary judgment on the issue of excessive force. Gassner himself indicates that he resisted Bates's attempt to spread-eagle him against the car, and that this resistance continued until Bates put him in a chokehold, wrestled him to the ground, and handcuffed him. Given Gassner's resistance to the arrest, the force used by Bates in this case was reasonable, and will not support a claim of excessive force. *See Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. Unit A Jan.1981).[11]

## VI.

To summarize, we hold that Bates is entitled to summary judgment on all of Gassner's claims under federal law. Because our decision on the unlawful arrest claim, however, is based upon a finding, not that the arrest was lawful, but that Bates is entitled to qualified immunity, we do not reach the issue of whether Bates is entitled to summary judgment on Gassner's state law claims. We thus find it appropriate to remand the case for further proceedings; we note, however, that on remand, the district court should consider whether to dismiss these claims without

---

**10.** It cannot be gainsaid that any driver should know this; no specific order to that effect is necessary or should reasonably be expected.

**11.** Gassner also alleges that he suffered small cuts and bruises on his wrists because the hand-

cuffs were put on too tight. Again, given Gassner's resistance to arrest and the slight nature of Gassner's injuries, we hold that Bates is entitled to summary judgment on the issue. *See Shillingford.* 634 F.2d at 265.

prejudice, now that there are no federal law issues remaining in the case. *See, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tarantino v. Baker,* 825 F.2d 772, 779 (4th Cir.1987).

We thus REVERSE the district court's denial of Bates's motion for summary judgment insofar as it relates to Gassner's claims under federal law, RENDER judgment in favor of Bates on those claims, and REMAND for further proceedings.