**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REBECCA COURTNEY RENN, by and
through her Guardians at Law;
MICHAEL RENN, individually and as
Guardian at Law of Rebecca Courtney
Renn; REBECCA RENN, individually
and as Guardian at Law of
Rebecca Courtney Renn,
Plaintiffs-Appellees,

v.

EDWARD GARRISON, Director of the

Pitt County Department of Social
Services, individually and in his
official capacity; PITT COUNTY
DEPARTMENT OF SOCIAL SERVICES,
individually and in its official
capacity; PETER SWORD, individually
and in his official capacity; MELANIE
KEE, individually and in her official
capacity; PHYLLIS THOMAS, individually
and in her official capacity,
Defendants-Appellants.

No. 95-1321

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, District Judge.
(CA-93-151-4-H)

Argued: September 25, 1995

Decided: November 12, 1996

Before WIDENER and LUTTIG, Circuit Judges, and
BEATY, United States District Judge for the
Middle District of North Carolina, sitting by designation.

Vacated and remanded by published opinion. Judge Widener wrote the opinion, in which Judge Luttig and Judge Beaty joined.

_____

**COUNSEL**

**ARGUED:** Kenneth Ray Wooten, WARD & SMITH, P.A., New Bern, North Carolina, for Appellants. Jeffery Benton Foster, FOSTER & BRADSHER, Greenville, South Carolina, for Appellees. **ON BRIEF:** Cheryl A. Marteney, WARD & SMITH, P.A., New Bern, North Carolina, for Appellants. Wallace W. Bradsher, Jr., Tina L. Fisher, FOSTER & BRADSHER, Greenville, South Carolina, for Appellees.

_____

**OPINION**

WIDENER, Circuit Judge:

Defendants-Appellants Pitt County, North Carolina Department of Social Services (DSS), Edward Garrison, the director of the DSS, and three DSS social workers, Peter Sword, Melanie Kee, and Phyllis Thomas, appeal the denial of their claims of qualified and absolute immunity, of their motion for a protective order, and to stay all matters relating to discovery. Plaintiffs are Michael and Rebecca Renn, husband and wife, of Greenville, N.C., and their minor daughter, Rebecca Courtney Renn. Plaintiffs allege defendants deprived them of their constitutional right of family privacy in violation of 42 U.S.C. § 1983 and committed various state torts including negligence, sexual harassment, malicious prosecution, and assault. The district court reached only the issue of qualified immunity and denied defendants' motion to stay discovery on that point. We reverse the decision of the district court denying qualified immunity to the individual defendants and remand the case for further proceedings.

As alleged in plaintiffs' amended complaint, the events leading to this suit began in December, 1992. Plaintiffs Michael and Rebecca Renn had been experiencing problems in discipline and in communicating with their teenage daughter, Rebecca Courtney Renn, and had

2

engaged Dr. Sam Williams, a psychologist, to assist them. Because of the problems, the Renns sent Courtney to her grandparents over Christmas of 1992. On December 28, 1992, after returning home, the child had a quarrel with her mother, took some clothes, and ran away to the house of Sylvia Measamer, a neighbor. She returned home on December 30th and January 3rd, but left again each time.

On January 5, 1993, defendant Peter Sword, an intake counselor at the Department of Social Services, called the Renns, saying the department had received a call about the child and that he needed to meet with them. A day or two later, the Renns met Sword at Dr. Williams' office and learned that Sylvia Measamer had filed charges of neglect against them, and that Sword had spoken to several people to investigate the child's home situation. Sword explained that he could not find any substantiation for the neglect charges, and that the significant inconsistencies in the stories he had been given caused him to conclude that he had "been lied to by some people." Sword said that Sylvia Measamer had been dissatisfied with his inability to substantiate neglect and had gone over his head to his supervisor, creating "a stir at the Department of Social Services."

Measamer refused to allow Courtney to go home to her parents unless DSS personnel were present, so on January 7, 1993, Sword accompanied Renn to pick up the child. Upon arriving home, the Renns told their daughter that they had decided to commit her to Coastal Plains Hospital for treatment. While Sword was still at the Renns' home, Courtney ran away to other neighbors, Barbara and Harry Sloan. Sword himself called the Sloans but could not persuade Sloan to return the child. Sword called the Greenville Police Department and retrieved Courtney from the Sloans' with the help of a police officer and Renn. Sword and the Renns then obtained involuntary commitment papers from the Pitt County Magistrate and took the child to Coastal Plains Hospital.

Plaintiffs allege that while at the magistrate's office and in the hospital waiting room, Sword displayed what Mrs. Renn interpreted as an inappropriate level of interest in her.[1] Despite this allegation, over

_____

[1] Plaintiffs allege that while at the magistrate's office, Sword appeared fascinated with Mrs. Renn and would not leave her side. On that and a

3

the ensuing eight months Sword did not initiate any contact with the Renns until a second incident occurred involving the child. He did, however, leave the neglect investigation open against them.

After Coastal Plains Hospital, Courtney was sent to a wilderness camp in Idaho for three weeks and then enrolled in a private school in Virginia. The school expelled her for disciplinary reasons on May 11, 1993. On May 14, 1993, she ran away to the Sloans' where she stayed until at least June 11, 1993. During the summer of 1993 the child also spent nights away from home at the apartment of a Mrs. Tyndall.

The Renns initiated the only contacts with DSS or Sword that took place between January and September, 1993. On June 11, 1993, they wrote to Sword complaining that the adults in their neighborhood were undermining their attempt to discipline the child by allowing her to run to them when she did not get her way at home. They told Sword that they were "seeking alternative methods in dealing with their child." Sword replied by letter on July 1, 1993, advising the Renns that he had no authority to "have impact" with the neighbors and suggesting they try alternative placement programs until they "got it right." On August 3, 1993, Mrs. Renn telephoned Sword to ask if he had completed investigating the neglect charge raised in January and informed him that Dr. Williams recommended enrolling Courtney in a facility called Three Springs in Pittsboro, N.C. Mrs. Renn also told Sword that she was afraid of her daughter because the child was becoming violent. Sword told Mrs. Renn he had left the investigation open. About August 5, 1993 Courtney hit her mother, bruising her arm. On Dr. Williams' advice, the Renns filed juvenile criminal charges against her. On August 5, 1993, Courtney ran away to the Tyndall apartment. Mrs. Renn wrote Sword a letter to inform him of these events. We are told by the Renns that they also requested that DSS workers attend counseling sessions with them and Dr. Williams.

In September when school started, Courtney skipped class, failed to complete assignments, and lied about notes to her parents sent

_____

few other occasions, Renn has alleged that Sword was unduly familiar with Mrs. Renn, his behavior constituting what might be called a pass at her as commonly understood. This does not state a federal question cause of action, however.

4

home by her teachers. Trouble happened over the weekend of September 11-12, 1993. It appears that on Saturday, September 11, 1993, Courtney left home before her parents returned from work. She left a note and called home, but stayed out until 12:30. Late Sunday evening, September 12, 1993, Renn received a phone call from a mother who claimed that Courtney had harassed her daughter. Renn confronted his daughter and an argument broke out. Courtney threw a tantrum and, cursing, attacked her father, who physically restrained her until she calmed down. When Renn left his daughter's room, she ran away.

The Renns called the police to pick Courtney up. They believed she was headed for the Tyndall apartment and the police found her there about two hours later. Courtney told the police her father had beaten her, and defendant Phyllis Thomas, a DSS case worker on duty that evening, became involved. Thomas phoned the Renns, telling them she intended to allow the child to remain at the Tyndall's for the night. Renn objected because he believed Mrs. Tyndall was emotionally disturbed and did not have custody of her own children. He explained that Courtney was under a psychologist's care and had a history of disciplinary problems that would be exacerbated by rewarding her rebellious behavior. Renn asked Miss Thomas to call Sword at home, or to call Connie Elkes, a police juvenile officer familiar with both the child and Mrs. Tyndall. Miss Thomas refused, citing DSS policy, but she called back at approximately 3:00 a.m. to tell the Renns that Courtney had been placed in a foster home and would see her parents in court in five days. To place Courtney in a foster home, DSS, acting through Miss Thomas, assumed emergency custody of the child. Courtney recanted her story about being beaten when she found out that she would not be allowed to stay at Mrs. Tyndall's.

On Monday, September 13, 1993, Renn called defendant Sword at DSS. Sword told Mr. Renn that his daughter had been dropped off at school that morning but by 8:00 a.m. had left in the company of Shannon Tyndall and another girl. Sword instructed Renn to leave Courtney's bedroom undisturbed after the previous night's ruckus, though he never came to look at it. Also that day, DSS filed a juvenile petition in state court to take temporary control of the child. The Renns called Sword at home at 9:30 that evening but their daughter had still not been located.

5

On Tuesday, September 14, 1993, Sword called Mrs. Renn and gave her the location of a neighborhood where the police, through a phone trace, thought the child might be. Sword told Mrs. Renn that the child had pawned a ring and offered to recover it. He also said that the agency's attorney had recommended that DSS surrender custody of the child but that he, Sword, told the attorney that the Renns wanted DSS to keep custody. Plaintiffs claim that Sword knew that they did not want DSS to retain custody and that his assertion to the agency attorney was false. Mrs. Renn and her father drove around the neighborhood until they spotted Courtney. The police and a social worker recovered the child the next day, September 15, 1993, and returned her to the foster home.

On September 15, 16, and 17, 1993, Sword telephoned the Renns to discuss the child's condition and possible placement options. He told them he wished to accompany them, and bring Courtney, to an interview the Renns had scheduled at the Three Springs facility on September 20, 1993.

Hearings with respect to Courtney's custody were held on September 15, 22, and 29, 1993. On September 29, 1993, the parties agreed that DSS would retain custody until Courtney was placed in Three Springs on October 4, 1993, but that the Renns could take her to the facility without being accompanied by a social worker. DSS dismissed the neglect petition and, on condition that it could verify the child's placement at Three Springs, agreed to dissolve custody as of October 6, 1993. The Renns signed a release allowing the DSS to call Three Springs through October 6, 1993. The state judge, apparently orally, instructed DSS not to interfere with the child's placement or to contact the child unless necessary.

On October 7, 1993, the Renns received notice that the agency could not substantiate the January 3, 1993 neglect referral. DSS gave no reason for the length of the investigation. On October 9, 1993, the Renns received a letter from Sword stating that DSS had substantiated a finding of "neglect for lack of proper discipline" as a result of an incident reported on September 13, 1993. The letter also said the case would be transferred to the family children's services unit and a new social worker would be assigned.

On October 22, 1993, defendant Melanie Kee, a DSS employee, called Three Springs to obtain information about the child. She stated, the Renns claim falsely, that she had a signed release from the Renns authorizing her to obtain information, that DSS had substantiated neglect against the Renns because they locked their daughter out of the house in January, 1993, and that DSS had remained involved in the case because of concerns for the child's safety if she returned home to her parents. Kee also contacted the Renn's attorney and Dr. Williams, attempting to obtain information.

Plaintiffs filed this suit on November 18, 1993 and filed an amended complaint on December 6, 1993. On November 24, 1993, DSS filed a juvenile petition to prevent obstruction or interference with investigation pursuant to N.C.G.S. § 7A-544.1. The obstruction petition was resolved by the entry of a consent order in state court that required plaintiffs to provide DSS with specific information but did not address the merits of this action. The parties agreed in the district court that the suit presented the following federal claims by the Renns, as summarized by the district court in its order filed January 20, 1995:

> (1) that defendants Kee and Sword deprived the plaintiff parents of their constitutional right to maintain control over, and the integrity of, their family unit, in violation of 42 U.S.C. § 1983;
>
> (2) that DSS had in place policies promoting the deprivations, thereby subjecting DSS to liability under§ 1983 as well;
>
> (3) that the individual defendants are liable in their official capacities;
>
> (4) that the substantiation process violates the Fourteenth Amendment . . .
>
> (5) that the defendant Thomas took custody of the minor child . . . without the consent of the plaintiff parents or a court order; and

7

(6) that DSS has threatened to sue the plaintiffs if they do not release their medical records, thereby violating plaintiffs' constitutional right to privacy.

On April 28, 1994, defendants had moved for a protective order and to stay discovery on all matters pending the court's decision on a summary judgment motion which Defendants filed on July 22, 1994. In addition to qualified immunity, defendants' summary judgment motion asserted absolute immunity, Eleventh Amendment immunity, and public officials immunity. By order filed January 20, 1995, the court denied defendants' motion to stay discovery and lifted its earlier stay. The court held that plaintiffs' rights to family privacy were clearly established and that genuine issues of material fact existed concerning the reasonableness of the defendants' conduct that justified discovery on the issue of qualified immunity. It denied the individual defendants' motion for summary judgment which claimed qualified immunity.[2] It did not otherwise rule on defendants' summary judgment motion.

The only issue we consider is whether the district court correctly determined that the individual defendants are not entitled to qualified immunity. "[A] district court's denial of a claim of qualified immunity . . . is an appealable final decision within the meaning of 28

_____

[2] The parties have treated the defendant's motion for summary judgment as denied. Appellants' brief at p.1, Appellees' brief at p.2, 30. They have argued on appeal the availability of the defense of qualified immunity.

We think the position in which the parties find themselves is not different from the position of the parties in the case of Cedar Coal v. United Mine Workers of America, 560 F.2d 1153, 1161-1162 (4th Cir. 1977). In Cedar Coal, a motion for a preliminary injunction had not been acted upon but had been continued by the district court"until the further order of the court." We treated that state of facts as a denial of the motion. The situation of the appellants is not different here. Their motion for summary judgment was filed and action on the same was deferred, although the court filed its opinion denying them qualified immunity. We think their position is not substantially different from that of the appellants in Cedar Coal, and we will proceed to the availability of the defense of qualified immunity.

8

U.S.C. 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). We review de novo the district court's denial of a defense of qualified immunity. Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994).

Qualified immunity shields public officials from personal liability for discretionary actions provided their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We have held that social services officials engaged in child abuse investigations "may properly assert qualified immunity in appropriate situations." Hodge, 31 F.3d at 162. The question of whether an official is entitled to qualified immunity may be answered as a matter of law by determining "whether the legal norms allegedly violated by the defendant[s] were clearly established at the time of the challenged actions . . . ." Mitchell, 472 U.S. at 528. To be clearly established, "[t]he contours of the [plaintiff's] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. City of Lancaster, 973 F.2d 295, 298 (4th Cir. 1992). The resolution of the legal question requires "consideration of the factual allegations that make up the plaintiff's claim." Mitchell, 472 U.S. at 528.

Plaintiffs here allege that defendants violated their constitutional right to family privacy. We considered that right in Hodge, stating that "the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment," Hodge, 31 F.3d at 163, but noting that it "is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest." 31 F.3d at 163-64. Curtailing abuse of a State's minor citizens is such a legitimate interest. 31 F.3d at 164. In addition, we said:

> [C]ircuit courts have strictly construed actionable violations
> of the familial privacy right to encompass only those
> instances where state officials' actions were directly aimed
> at the parent-child relationship . . . implicated the most
> essential and basic aspect of familial privacy -- the right of

9

> the family to remain together without the coercive interference of the awesome power of the state . . . drove a wedge into [a] family and threatened its very foundation . . . or eroded the family's solidarity internally and impaired the family's ability to function.

31 F.3d at 163 (citations omitted).

Plaintiffs' problem in this case is that, accepting their allegations as true, the facts do not show that defendants acted outside of the authority granted to them by state statute, much less intruded so vigorously into the Renn family as to infringe their family privacy right. Initially, we note that the state statutes granting authority for the agency's actions plainly take into account plaintiffs' fundamental interest in family privacy and integrity. The record does not show any lack of respect by the defendants for these requirements, however. North Carolina general statute § 7A-542 states the purpose of child protective services to be:

> [T]o help the parents or other caretakers and the court to prevent abuse or neglect, to improve the quality of child care, to be more adequate parents or caretakers, and to preserve and stabilize family life.

N.C. Gen. Stat. § 7A-542 (1995).

North Carolina general statute § 7A-544 provides clear authority for Miss Thomas's action in taking custody of Courtney on the night of September 12, 1993, after Courtney ran away to the Tyndall apartment and reported to police that her father had beaten her:

> When a report of abuse, neglect, or dependency is received, the Director of the Department of Social Services shall make a prompt and thorough investigation in order to ascertain the facts of the case, the extent of abuse or neglect and the risk of harm to the juvenile, in order to determine whether protective services should be provided . . ..
>
> If the investigation indicates that abuse, neglect, or dependency has occurred, the Director shall decide whether

10

immediate removal of the juvenile . . . is necessary for their protection. If immediate removal does not seem necessary, the Director shall immediately provide or arrange for protective services. If the parent . . . refuses to accept the protective services provided or arranged by the Director, the Director shall sign a complaint seeking to invoke the jurisdiction of the court for the protection of the juvenile or juveniles.

If immediate removal seems necessary for the protection of the juvenile . . . the Director shall sign a complaint which alleges the applicable facts to invoke the jurisdiction of the court. Where the investigation shows that it is warranted, <u>a protective services worker may assume temporary custody of the juvenile for the juvenile's protection</u>.

N.C. Gen. Stat. § 7A-544 (1995) (emphasis added). Under North Carolina statutes, a juvenile who suffers bruises and internal abrasions while being disciplined has been held to be a "neglected juvenile." <u>In re Thompson</u>, 306 S.E.2d 792, 794 (N.C.App. 1983); N.C. Gen. Stat. § 7A-517. Thus, Courtney's report that she was beaten by her father was properly treated, at least initially, as a "report of abuse or neglect" per § 7A-544, since bruises, abrasions or more serious injuries are the likely consequences of a beating. Given the late hour of the report and the fact that it was personally communicated to police on the scene at the Tyndall apartment, Miss Thomas's ability to investigate was limited and the report was entitled to be credited until a more thorough investigation could be made. Since Courtney had already left the home, removal was unnecessary, however Renn refused to accept Miss Thomas's decision to allow Courtney to stay at the Tyndall apartment for the night. Faced with a second report of neglect on Courtney, this time originating with the child herself in the late night or early morning hours of September 12 or 13, 1993 after the child had left the home, Miss Thomas did not act outside the authority conferred by state statute, and, we are of opinion, did not violate plaintiffs' clearly established rights, in temporarily placing Courtney in a foster home. Section 7A-571 expressly allows a DSS worker to take a child into temporary custody in these circumstances without a court order. N.C. Gen. Stat. § 7A-571 (1995).

11

Section 7A-544 likewise provides authority for Miss Kee's telephone calls seeking information about Courtney after the child was placed at Three Springs and provides in pertinent part:

> In performing any duties related to the investigation of the complaint or the provision or arrangement for protective services, the Director may consult with any public or private agencies or individuals . . . who shall assist in the investigation and evaluation of the seriousness of any report of abuse, neglect, or dependency when requested by the Director. The Director or the Director's representative may make a written demand for any information or reports, whether or not confidential, that may in the Director's opinion be relevant to the investigation of or the provision for protective services. Upon the Director's or the Director's representative's request . . . any public or private agency or individual shall provide access to and copies of this confidential information and these records to the extent permitted by federal law and regulations.

N.C. Gen Stat. § 7A-544 (995).

With regard to defendant Sword, plaintiffs claim that the length of his investigation of the January complaint and the level of interference with the family that the investigation entailed violated plaintiffs' family privacy right. Plaintiffs point to North Carolina's child protective services regulations to suggest that the investigation should have been completed in 30 days, but the regulations do not impose any mandatory period and acknowledge that more complex cases will take longer to investigate, rather requiring documentation and supervisor's knowledge of the reason for any delay.

> The statutory requirement and professional obligation to conduct prompt investigations of child abuse, neglect, and dependency underscore the need to expedite the investigative process. Extensive delay in making a case decision can be seen as an unwarranted intrusion in a family and sometimes increases the risk for children. In many instances, agency investigations can be completed and a case decision made within 30 days of receipt of the report. When case cir-

12

cumstances delay the prompt completion of an investigation, the case record needs to document the reasons for the delay and supervisory-level knowledge of the delay.

North Carolina Division of Social Services Family Services Manual, Vol. I Ch. VIII, standard # 22. Because the question of qualified immunity logically arises when officials are operating outside their clear grant of authority from the State, the Supreme Court has sought to keep the focus on the rights alleged to be violated, rather than on the conduct of the officials. In Davis v. Scherer, 468 U.S. 183 (1984), the Court explained "officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action . . . ." Davis, 468 U.S. at 194 n.12. Plaintiffs here have not identified any regulation or statute imposing a time limit on a neglect or abuse investigation.

Of equal or more importance is that, beside promptness, § 7A-544 requires thoroughness in the investigation of alleged abuse or neglect. The child protective services regulations carefully address that thoroughness not only by mandating a broad scope in information acquisition but also by distributing responsibility for analysis and decision-making among DSS staff members:

> Determining whether a child is abused, neglected, or dependent requires careful assessment of all information obtained during the investigative process and the use of professional judgment . . . . While initially the focus is on the allegations contained in the report, additional concerns related to the child or other children may be known to the agency or revealed during the course of the investigation. The case decision must therefore reflect assessment of all evidence and facts available.

. . . .

> The case decision making process is to be shared. At a minimum, the worker and supervisor must make the decision. A team approach to decision-making has several advantages. It allows for various viewpoints and discussion which could be a valuable learning tool for newer staff. It may lead to

13

greater consistency in decision-making. It allows for shared liability and responsibility. Making a decision to substantiate or not can have far-reaching implications for children and families, and it is not something that can be taken lightly.

North Carolina Division of Social Services Family Services Manual, Vol. I Ch. VIII, at p.23 and standard #21. Thus, it is unlikely that Sword was responsible for the length of the investigation. Regardless, we are of opinion that under the circumstances facing Sword, he violated no clearly established right of plaintiffs. Under the regulations, Sword was required to extend his investigation beyond the allegations contained in Sylvia Measamer's complaint. In North Carolina, a neglected juvenile is a child who:

> does not receive proper care, supervision, or discipline from the juvenile's parent guardian, custodian, or caretaker; or who has been abandoned; . . . or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare . . . .

N.C. Gen Stat. § 7A-517 (21). The child's history of problems, the involvement of the psychologist, the refusal of other adults in the neighborhood to cooperate, Courtney's problems in school, inability to successfully remain in out-of-home placement and frequent runaway episodes, and, ultimately, the filing of juvenile criminal charges are all factors that, taken together, suggest that neglect may be occurring and which, combined with Measamer's complaint, justify ascertainment of facts by the State under the authority of § 7A-544 "to determine whether protective services should be provided." N.C. Gen Stat. § 7A-544.

The Renns offer no factual basis to demonstrate that Sword's involvement constituted anything other than limited monitoring, frequently at the Renns' request. Plaintiffs' own allegations preclude any conclusion that Sword's involvement in the Renn's family constituted a "familial privacy infringement of constitutional magnitude." Hodge, 31 F.3d at 157. Sword did not initiate any contact with the Renns for over eight months between the January and September incidents, yet the Renns themselves sought Sword's involvement on many occa-

14

sions: in their counseling sessions with Dr. Williams, in their relationships with their neighbors, in their search for out-of-home placement, when Courtney's behavior became more violent; and in their dealings with the agency on the night of the second incident. Plaintiffs' facts do not show that Sword's actions or his level of involvement with the Renn family were "designed to have, have had, or even will have, a significant impact on the parent-child relationship or on their family's ability to function." 31 F.3d at 157.

We are of opinion and hold that the individual defendants acted within the authority granted by state statute. Accepting plaintiffs' allegations as true, we find as well that their actions were reasonable under the circumstances in relation to the boundaries of the family privacy right that had been clearly established. We hold, therefore, that the district court erred in deciding that the defendants were not entitled to qualified immunity.

We are also asked on appeal to hold that the individual defendants are, in their official capacities, and that Pitt County Department of Social Services is, an arm of the State of North Carolina and therefore immune from suit under the Eleventh Amendment, and also otherwise absolutely immune from suit. These questions were not addressed by the district court, however. We ordinarily do not consider questions not considered by the district court and do not consider these questions here. McGowan v. Gillenwater, 429 F.2d 586, 587 (4th Cir. 1970).

We are also asked to consider various other questions, none of which is so inextricably intertwined with the district court's decision to make necessary a review of them to insure meaningful review of the qualified immunity decision of the district court. Accordingly, we do not consider the same. Swint, et al. v. Chambers County Commission, 63 U.S.L.W. 4189, 4193, No. 93-1636 (1995). It is not remiss, however, to note in passing that many, or even all, of the questions remaining in the case may well be answered by our decision here.

The decision of the district court denying qualified immunity to the individual defendants must be vacated and the case remanded to the district court to enter its order granting qualified immunity to the indi-

15

vidual defendants and for further proceedings not inconsistent with this opinion.

<u>VACATED AND REMANDED WITH INSTRUCTIONS</u>

16