**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GAYLE MARTIN, individually and as
parent and custodian of her minor
children, Justin Martin and Jaime
Martin,

           *Plaintiff-Appellant,*

    v.

SAINT MARY'S DEPARTMENT OF
SOCIAL SERVICES; KATHLEEN COULBY;
ALEXIS ZOSS,

           *Defendants-Appellees.*

No. 99-2107

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
J. Frederick Motz, District Judge.
(CA-98-3288-JFM)

Argued: March 2, 2000

Decided: October 8, 2003

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Widener wrote the majority
opinion, in which Judge Niemeyer joined. Judge Traxler wrote a dis-
senting opinion.

---

## COUNSEL

**ARGUED:** Kenneth Everett McPherson, Riverdale, Maryland, for
Appellant. Shelly Eilene Mintz, Assistant Attorney General, Balti-

more, Maryland, for Appellees. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Elise Song Kurlander, Staff Attorney, Baltimore, Maryland, for Appellees.

---

### OPINION

WIDENER, Circuit Judge:

Plaintiff Gayle Martin appeals the district court's grant of summary judgment to the defendants, St. Mary's County Department of Social Services, Alexis Zoss, and Kathleen Coulby. Miss Martin sued the defendants pursuant to 42 U.S.C. § 1983 after her children were removed from her home for one night in October 1997. Miss Martin does not appeal the district court's judgment in favor of defendant St. Mary's County Department of Social Services (St. Mary's Department) under the Eleventh Amendment. She appeals, however, the district court's grant of qualified immunity to defendants Alexis Zoss and Kathleen Coulby. For the following reasons, we affirm the district court's judgment.

### I.

We review the facts in this appeal in the light most favorable to the non-movant. *Mensh v. Dyer*, 956 F.2d 36, 39 (4th Cir. 1991). Miss Martin is the mother of two minor children, Justin, born on April 16, 1989, and Jaime, born September 16, 1995. St. Mary's Department is a Maryland state agency charged with investigating allegations of child abuse and neglect and authorized by the state to take temporary custody of a child if it believes that the child is in serious, immediate danger. See Md. Code Ann., Family Law § 5-709(c) (1999).

Prior to the events at issue in this appeal, St. Mary's Department was involved with Miss Martin's family, specifically through investigations regarding Justin and Miss Martin's other child, Jessica. In January 1997, St. Mary's Department received a referral stating that Miss Martin had neglected Justin by allowing Justin to stay home from school for half of the school year. This referral prompted the events at issue in this appeal.[1] At that time, Justin was part of the

---

[1]School records showed that Justin missed 66 days of kindergarten and 71 days of first grade. Miss Martin disputed these numbers during the

Chronic Health Impaired Program, a school sponsored program for children with illnesses in which teachers travel to the ill student's home to provide instruction. A teacher had not visited since November 1996 due to Miss Martin's refusal. Based on the referral, Mrs. Coulby, a Child Protective Services Investigator for St. Mary's Department, and her supervisor, Miss Zoss, investigated the allegation. In May 1997, they filed a petition in the circuit court seeking a finding that Justin was a "Child in Need of Assistance" (CINA)[2] and that Justin and Jaime required shelter care.

The circuit court held a Shelter Care Hearing on May 14, 1997. Thereafter, the circuit court ordered that: 1) legal care and custody of Justin be with St. Mary's Department, but that both Justin and Jaime would remain in Miss Martin's physical custody; 2) Miss Martin must make a good faith effort to ensure Justin's school attendance; 3) the parties must submit to a family psychological evaluation; and 4) Miss Martin must attend counseling. The first hearing served as an arraignment and the circuit court set a later date for the adjudicatory hearing of the CINA petition. In an adjudicatory hearing the court determines whether the allegations in the petition, other than allegations that the child requires the court's assistance, treatment, guidance or rehabilitation, are true. See Md. Code Ann., Courts and Judicial Proceedings § 3-801(b) (1998). The CINA hearing was ultimately set for October 16, 1997.[3]

In July 1997, while the CINA petition was pending, Miss Martin moved with her children to Los Angeles, California. Miss Martin alleged that she told Mrs. Coulby, her family, and the post office that she was moving. After arriving in Los Angeles, Miss Martin and her children moved into a community center, and Justin began to attend school near their residence. At approximately the same time, Mrs.

---

investigation.

[2]The Maryland Code defines "Child in Need of Assistance" as one who requires the assistance of the court because he or she is mentally handicapped or not receiving ordinary and proper care and attention and the parents are unable or unwilling to give such care. Md. Code Ann., Courts and Judicial Proceedings § 3-801(f) (1998).

[3]The hearing was apparently held on October 15, 1997.

Coulby left St. Mary's Department on maternity leave and did not return until October 8, 1997.[4]

On October 9, 1997 at approximately 10:45 p.m. (Pacific Time), members of both the Los Angeles Department of Child Services (Los Angeles Department) and the Los Angeles Police Department (Los Angeles Police) arrived at Miss Martin's residence to remove the children to take them to Maryland for the CINA hearing. Miss Martin alleged in her complaint that Mrs. Coulby and Miss Zoss told the Los Angeles Department that emergent circumstances existed and that the circuit court had granted an order for Miss Martin's children to be returned to Maryland in the custody of St. Mary's Department. Miss Martin refused to surrender custody, and the Los Angeles Department forcibly removed her children and held them overnight in a Los Angeles Department facility. The record does not indicate that St. Mary's Department requested or petitioned for the circuit court's assistance in obtaining physical custody of Justin and Jaime Martin at any time.

On October 10, 1997, the circuit court in Maryland granted an emergency order directing St. Mary's Department to call the Los Angeles Department and to return the Martin children to the home of Miss Martin. St. Mary's Department was also present at the emergency hearing and agreed with Miss Martin's attorney to release the children to their mother, with the previous orders of the court to remain in effect. The Los Angeles Department returned the Martin children to Miss Martin at 11:00 p.m. (Pacific Time) on October 10, 1997.

Subsequently, on September 28, 1998, Miss Martin filed this 42 U.S.C. § 1983 action against St. Mary's Department, Miss Zoss, and Mrs. Coulby (the defendants) in the United States District Court for the District of Maryland. In her complaint, Miss Martin also alleged several state law claims. The defendants filed a motion to dismiss or, in the alternative, a motion for summary judgment. The district court

---

[4]In her affidavit, Mrs. Coulby asserted that upon her return from maternity leave, she worked in the Service Intake Division and did not work on the Martin case.

granted the defendants' motion for summary judgment on July 12, 1999.[5] Miss Martin appeals from that judgment.

We review the district court's grant of summary judgment *de novo*. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The moving party is entitled to summary judgment only if no genuine issue of material fact exists. Fed. R. Civ. Pro. 56(c).

## II.

Miss Martin argues that the district court erred by granting the defendants qualified immunity for three reasons: 1) her rights to familial integrity and due process of the law were sufficiently clear to enable the defendants to know that the children should not have been removed from Miss Martin's custody without a court order;[6] 2) a genuine dispute existed about whether the defendants knowingly made false representations to the Los Angeles Department or whether the defendants had an objectively reasonable belief that the children were in immediate danger; and 3) the defendants failed to initiate a post-deprivation hearing for Miss Martin, rather Miss Martin's counsel initiated it. We turn first to the issue of qualified immunity.

## A.

Qualified immunity shields public officials from personal liability for performance of their official duties, provided that they do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court considers whether the rights allegedly violated by the public official were clearly established at the time of the challenged conduct, *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985), and whether such conduct was objectively reasonable. *Harlow*, 457 U.S. at 818. "As such, if there is a 'legitimate question' as

---

[5]The district court declined to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) and dismissed Miss Martin's state law claims without prejudice.

[6]Miss Martin recognizes that if a social worker believes a child to be in immediate danger, the social worker may remove the child from the parents' custody as long as a post-deprivation hearing is provided.

to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) (citing *Tarantino v. Baker*, 825 F.2d 772, 775 (4th Cir. 1987)), *cert. denied sub nom. Wiley v. Mayor of Baltimore*, 516 U.S. 824 (1995). We have held that social workers may assert qualified immunity in appropriate circumstances. See *Hodge v. Jones*, 31 F.3d 157, 162 (4th Cir.) (citing *Wildauer v. Frederick County*, 993 F.2d 369, 373 (4th Cir. 1993)), *cert. denied*, 513 U.S. 1018 (1994).

Miss Martin alleges that the defendants violated her rights to familial integrity and due process of law by making misrepresentations to the Los Angeles Department causing the removal of her children for one night. First, we note that although the family unit is a "fundamental precept firmly ensconced in the Constitution and shielded by Due Process," it is "neither absolute nor unqualified." *Hodge*, 31 F.3d at 163. A state has a legitimate interest in protecting children from neglect and abuse and in investigating situations that may give rise to such neglect and abuse. See *Renn by and through Renn v. Garrison*, 100 F.3d 344, 349-350 (4th Cir. 1996). Because of the complicated balance between parents' rights to raise their children and a State's interest in protecting its minor citizens, the right to familial integrity is "amorphous" in many cases. See *Hodge*, 31 F.3d at 164. The contours of the right to familial integrity may not be "sufficiently clear" in certain situations, to be deemed "clearly established" as required. See *Renn*, 100 F.3d at 349 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A public official must decipher what conduct violates protected rights, but an official will not be held liable for "bad guesses in gray areas." *Maciarello v. City of Lancaster*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).

In this case, the circuit court in Maryland took away Miss Martin's legal custody of Justin after the initial CINA proceeding; however, that court permitted her to keep physical custody of both children and legal custody of Jaime. In its order granting legal custody of Justin to the St. Mary's Department, the circuit court made clear that it expected St. Mary's Department and Miss Martin to work together to improve the Martin family situation through concerted efforts to transport Justin to school and Miss Martin to counseling. During the hearing, the circuit court thanked St. Mary's Department for its

involvement in the Martin family affairs and expressed its belief that the situation had the potential to improve. The circuit court then set the adjudicatory hearing for October 1997. Miss Martin's subsequent move to California did not cause St. Mary's Department to lose its interest in or its legal custody of Justin at any time.

B.

Even assuming that the right to familial integrity was clearly established at the time of the defendants' alleged conduct, the facts and the record do not show that the defendants committed any intentional wrong-doing, "much less intruded so vigorously into the [Martin] family as to infringe their family privacy right." *Renn*, 100 F.3d at 349. This is especially true given the St. Mary's Department's legal custody of Justin and the status of the pending CINA petition. In fact, at the time of the events in Los Angeles, Miss Martin and her children were then required to be present at the CINA adjudicatory hearing only some five or six days later.

The record in this case is devoid of evidence that demonstrates the defendants' alleged misrepresentations to the Los Angeles Department. Miss Martin alleged in her complaint that a Los Angeles Department social worker told her that he had a court order from Maryland to remove her children. Another affidavit, submitted by Patricia Jackson, the children's court appointed attorney, stated that the defendants did not describe an emergency situation to her that would have warranted the removal of the Martin children. But, the record does not contain any affidavits from any Los Angeles Department workers or other evidence based on personal knowledge to establish the alleged misrepresentations. We agree with the district court's assessment of any communications between St. Mary's Department and the Los Angeles Department with respect to the Martin children. These communications constituted "matters of judgment and interpretation." It held the conclusions or actions based on these communications "could have arisen from a misunderstanding in the communication." We agree.

Because the record falls short on the facts and does not indicate that the defendants made misrepresentations to the Los Angeles Department, and because any actions on the part of the defendants

causing the removal of the Martin children could have arisen from a misunderstanding, we are of opinion that the defendants' conduct was no more than negligent conduct, if that. "Where a government official's act causing injury to life, liberty, or property is merely negligent, no procedure for compensation is *constitutionally* required." *Daniels v. Williams*, 474 U.S. 327, 333 (1986) (internal quotations omitted) (emphasis is the Court's). Because a § 1983 claim cannot be sustained, it follows that the defendants are entitled to qualified immunity. See *Clark v. Link*, 855 F.2d 156, 166 (4th Cir. 1988).

## C.

We also reject Miss Martin's claim that the defendants violated her due process rights because her counsel, rather than St. Mary's Department, initiated the post-deprivation hearing. First, due process is a flexible concept. See *Jordan by Jordan v. Jackson*, 15 F.3d 333, 348 (4th Cir. 1994). Secondly, Miss Martin received a post-deprivation hearing and the St. Mary's Department directed the return of her children to her within 24 hours of their removal.

For the foregoing reasons, the district court's judgment granting the defendants' motion for summary judgment is accordingly

*AFFIRMED*.

TRAXLER, Circuit Judge, dissenting:

At the time Justin and Jaime were removed from Gayle Martin's custody, clearly established substantive due process principles prohibited government officials from removing a child from the custody of his or her parent without either prior judicial authorization or evidence that the child faced an imminent risk of harm to his or her health and well-being if the parent maintained custody. Viewed in the light most favorable to Martin, including the reasonable inferences to be drawn therefrom, the record before us shows that Alexis Zoss directed the removal of Justin and Jaime from Martin's custody, even though no court had ordered it and nothing suggested the children were in imminent danger from abuse or neglect. Particularly troubling is the removal of Jaime, who was not even of school age and who

remained in the sole legal and physical custody of Martin — there was no reason conceivable for her to be taken. I believe it is erroneous to require Martin to prove that Zoss made misrepresentations to the Los Angeles Department of Social Services ("LADSS"). In my view, Martin can prove that Zoss infringed upon her fundamental liberty interest in the custody and control of her children through Martin's evidence that there was no factual or legal basis for Zoss to direct the removal of the children. The taking of children from their parents by a government official without reason is unquestionably egregious and arbitrary conduct. Evidence that Zoss used a misrepresentation to gain custody might strengthen Martin's claim, but it is not essential to Martin's claim. Consequently, I find no deficiency in Martin's proof even if there is a lack of direct evidence as to a misrepresentation by Zoss.

Moreover, I find no evidence of any miscommunication between Zoss and LADSS, which the district court offered as a possible theory for the unexplained removal of the children. Zoss submitted an affidavit to the district court, but in it she says nothing about what LADSS was told and she offers no justification whatsoever for the seizure of the children.

I therefore must respectfully dissent from the conclusion that Zoss is entitled as a matter of law to qualified immunity on Martin's substantive due process claim. I would vacate that portion of the district court's order and remand so that Martin could continue to pursue this cause of action.

## I.

In January 1997, the St. Mary's Department of Social Services ("SMDSS") received a Child Protective Services referral alleging that Justin had missed over half of his first grade school year. Justin, who suffered from asthma, had been placed in the school's Chronic Health Impaired Program ("CHIPS program") which provided weekly home visits by a school tutor. According to school officials, however, the home tutors were only able to establish very limited direct contact with Justin. Kathleen Coulby, an SMDSS employee, began investigating the referral and learned school officials were concerned that many of Justin's absences were not genuinely linked to his health problems.

Coulby was informed that because Justin had never been taught on a regular basis, the school had been unable to assess his learning disabilities. Coulby eventually spoke to Martin, who denied that Justin had missed an untoward amount of school. Nevertheless, Martin agreed to submit Justin to a mental health evaluation conducted by Dr. Heidi Daniels. Dr. Daniels, whose conclusions are not part of the record submitted to the panel, apparently determined that Justin's chronic absences from school resulted in "mental injury." J.A. 90.[1] No such determination was made regarding Jaime who, at 18 months of age, was far too young to attend school. SMDSS does not suggest that Justin and Jaime were being physically abused or neglected or that they were at risk of physical abuse or neglect.

Based on Coulby's investigation, SMDSS petitioned for an order declaring both Justin and Jaime to be Children in Need of Assistance ("CINA"), and, pending a hearing on the merits of the CINA petition, removing them from the home and placing them in shelter care with SMDSS.[2] The CINA petition sought the same relief for both children even though there were no specific allegations regarding why the state was entitled to remove the younger child, Jaime, from her mother.

On May 14, 1997, a juvenile master held a hearing to determine whether Justin and Jaime should be removed and placed into temporary shelter care. SMDSS called as a witness Susan Joyce, a social worker who, based on 90 minutes of observation, testified that she believed Justin "[was] suffering from neglect, mental injury." J.A. 74. No evidence or testimony was presented in support of SMDSS's assertion that Jaime should be taken from her mother — the evidence

---

[1]Maryland law defines "mental injury" as "the observable, identifiable, and substantial impairment of a child's mental or psychological ability to function." Md. Code Ann., *Cts. & Jud. Proc.* § 3-801(r).

[2]"Shelter care" is "temporary placement of a child [who is alleged to be a CINA] outside of the home" until a final decision can be made on the merits of the CINA petition. Md. Code Ann., *Cts. & Jud. Proc.* § 3-815(f)(2)(ii). A judicial hearing is required before SMDSS can put a child into shelter care, but SMDSS may place a child in "emergency shelter care" prior to obtaining a court order "to protect the child from serious immediate danger." *See* Md. Code Ann., *Cts. & Jud. Proc.* § 3-815(b)(1).

and testimony focused exclusively on Justin. The master concluded that Justin's "[c]ontinuation in the home is not contrary to [his] welfare," J.A. 55, and permitted Martin to retain physical custody of Justin. However, the master granted legal custody of Justin to SMDSS pending the final disposition of the CINA petition, and ordered Martin to "make a good faith effort to ensure Justin['s] . . . attendance [at] school." J.A. 56. The master also required that the family undergo a "family psychological evaluation" and that Martin attend an "individual counseling and/or a parenting/child development class in an effort to better understand the developmental and educational needs of a child." J.A. 56. The master did not grant any portion of SMDSS's petition with respect to Jaime.

After the shelter care hearing, Dr. James Lewis, whom SMDSS listed as its expert witness, performed the psychological evaluation and concluded that "[d]espite the psychological data which suggests that Justin has not been provided ordinary and proper care sufficient to make age and grade-level educational and psychosocial progress," Justin was "very positively and closely bonded to his mother and sister, such that he would be psychologically harmed if the next remedy implemented is removal from his parental home." J.A. 99. Moreover, Dr. Lewis noted that Jaime was also "very closely and positively bonded" to Martin and would be "hurt psychologically" by removal from the parental home. J.A. 95. These findings were set forth in a report dated July 29, 1997, which was provided to Coulby.

The adjudication hearing on the CINA petition was set for August 28, 1997. In late July, however, Martin decided to move with her children across the country to Los Angeles, California. According to Martin, she informed Coulby and two additional SMDSS employees of the move, as well as family members in Maryland. Coulby went on maternity leave about this time and had no further involvement with the case; Zoss, Coulby's supervisor, apparently assumed an active role in the Martin case. Upon arriving in Los Angeles, the Martin family temporarily settled into a community shelter, and Justin began attending school nearby. Martin filed a formal change of address with the United States Postal Service and obtained a California identification card. She also notified SMDSS of her new address in California.

According to Martin's unrefuted affidavit, on October 9, 1997, at 10:45 p.m., social workers with LADSS appeared unannounced at the

shelter where the Martins were living and demanded custody of Justin and Jaime, who were sleeping. The social workers were accompanied by police officers. LADSS informed Martin that a court in Maryland had issued an order authorizing the removal of Justin and Jaime from her and that the children were to be flown to Maryland the following day where they would remain in the custody of SMDSS. Martin eventually permitted the children to be taken only after she became convinced that SMDSS had indeed obtained such a court order and that she risked arrest if she did not cooperate. LADSS took Justin and Jaime crying and screaming from their mother and held them until the next night.

Zoss does not dispute that she directed LADSS to take the Martin children. It is also undisputed that there was no court order directing that Justin or Jaime be removed from their mother's physical custody. Moreover, there was no emergency at the time that placed the children in "serious immediate danger," Md. Code Ann., *Cts. & Jud. Proc.* § 3-815(b), and Zoss does not suggest otherwise. Zoss nevertheless directed that the Martin children be removed without prior notice or a hearing, as required by Maryland law in a nonemergency. *See* Md. Code Ann., *Cts. & Jud. Proc.* § 3-815.

On the following day, Zoss "called [Martin] twice . . . and threatened to keep the children and have [Martin] arrested if [she] did not return to Maryland for the adjudication hearing," J.A. 108, which had been rescheduled for the next week. Martin contacted her attorney in Maryland who filed an emergency motion in Maryland circuit court seeking the immediate return of Justin and Jaime. The attorney appointed to represent the interests of the children also believed that the children should be returned immediately to Martin because she perceived no emergency or other "factual or legal basis for removing the children from their mother on October 9, 1997." J.A. 111. Zoss disagreed, insisting that the removal had been appropriate because the case involved "'mental injury.'" J.A. 112. At the emergency hearing, however, SMDSS agreed to direct LADSS to return the children. At 11:00 p.m. on October 10, Justin and Jaime were returned to their mother. Martin subsequently filed a motion to dismiss the underlying CINA petition, which SMDSS agreed to do.

Martin filed this § 1983 action against Coulby and Zoss, in their official and individual capacities, as well as SMDSS. The district court accepted Martin's view of the evidence but awarded qualified immunity to Zoss because, in its view, Martin failed to demonstrate that the constitutional right at issue was clearly established. Also, the court concluded that Martin's claim against Zoss failed because there was no support in the record for her claim that Zoss made misrepresentations to LADSS. I cannot agree.[3]

## II.

Social workers performing discretionary functions, as Zoss was here, are protected by qualified immunity "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White by White v. Chambliss*, 112 F.3d 731, 735 (4th Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether Zoss is entitled to qualified immunity, we follow a two-step analytical process. Before considering the qualified immunity question, we must decide if Martin has alleged the deprivation of a constitutional or statutory right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). That inquiry requires us to determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the [official's] conduct violated a constitutional right." *Id.* If so, then we proceed to the second task, which "is to ask whether the constitutional right was clearly established in the specific context of the case." *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002) (internal quotation marks omitted); *see also Wilson v. Layne*, 526 U.S. 603, 609 (1999).

### A.  *Constitutional Violation*

The Fourteenth Amendment's directive that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process

---

[3]SMDSS was dismissed from the action and Martin does not seek review of that ruling. The record contains unrefuted evidence that Coulby's involvement in the Martin case ended prior to October 9, 1997, when the children were removed. Accordingly, I would affirm the district court's grant of summary judgment to Coulby.

of law" prohibits "certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal quotation marks omitted). Thus, the Due Process Clause of the Fourteenth Amendment "guarantees more than fair process" and "includes a substantive component that provides heightened protection against government interference with certain fundamental rights." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (internal quotation marks omitted).

The core of the concept of substantive due process is the "protection of the individual against arbitrary action of government," *Lewis*, 523 U.S. at 845 (internal quotation marks omitted), *i.e.*, protection against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," *id.* at 846. The substantive component of the Due Process Clause limits arbitrary government action whether such power is exercised by a legislative body or by an individual member of the executive branch, and the application of substantive due process review differs based on what kind of governmental action we are reviewing. *See id.* at 847 n.8.

If, as is the case here, our focus is on a purported abuse of executive power rather than the propriety of a legislative enactment, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 846 (internal quotation marks omitted). Thus, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8; *see United States v. Salerno*, 481 U.S. 739, 746 (1987). "[T]he kind of executive conduct that fairly can be said to shock the conscience . . . involves abusing executive power, or employing it as an instrument of oppression." *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (internal quotation marks and alteration omitted). In considering whether the conduct at issue qualifies as conscience-shocking, we look to see if "history, tradition and precedent demonstrate[ ] that the right asserted was one entitled to substantive due process protection." *Id.* at 739.

"[T]he interest of parents in the care, custody, and control of their children" has been described as "perhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court. *Troxel*, 530

U.S. at 65; *see Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Meyer v. Nebraska*, 262 U.S. 390 (1923). The Supreme Court has consistently reaffirmed that the contours of substantive due process apply to hem in the state's power to interfere with a parent's right to custody and control of her child. *See Troxel*, 530 U.S. at 66 ("In light of th[e] extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.").

This fundamental right is not absolute, however. "The parent's right to custody is subject to the child's interest in his personal health and safety and the state's interest as *parens patriae* in protecting that interest." *Chambliss*, 112 F.3d at 735. In cases involving a pre-hearing removal of children from parental custody by state officials, we have concluded that substantive due process is satisfied when the caseworker has "some evidence of child abuse" or a reasonable basis to suspect the child is in immediate danger of serious harm. *Weller v. Dep't of Soc. Servs. for Baltimore*, 901 F.2d 387, 391-92 (4th Cir. 1990) (applying the shocks-the-conscience test); *see Chambliss*, 112 F.3d at 736-37 (holding that caseworker acted within the bounds of substantive due process where there was evidence of abuse and where the statutory precondition that the child be in danger was satisfied); *cf. Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994) ("[I]t is well-settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child."). The converse, it seems to me, is self-evident — a state official runs afoul of a parent's fundamental liberty interest in the care, custody and control of her child when the official removes the child without any reason to believe the child is suffering abuse or is in imminent danger of serious harm. I am hard pressed to think of executive conduct that is more arbitrary or abusive. *See, e.g.*, *Suboh v. District Attorney's Office of Suffolk*, 298 F.3d 81, 92-93 (1st Cir. 2002); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000); *Hatch v. Dep't for Children, Youth & Families*, 274 F.3d 12, 20-24 (1st Cir. 2001); *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000); *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir. 1991).

Based on the sparse record, Martin's version of events is literally unrefuted and, in my view, recounts conduct by Zoss that was wholly arbitrary and satisfies the stringent "shocks the conscience" standard. For me, the key is in Zoss's failure, for whatever reason, to supply any justification at all, let alone to identify evidence of child abuse or imminent danger, for having the children (Jaime in particular) removed from Martin. The record is simply devoid of any evidence from which I can conclude that Zoss's decision to have these children removed was not capricious. Everyone — from the attorneys serving as guardians *ad litem* for the children to Zoss herself, apparently — agrees that there was no emergency. There was no evidence that Justin or Jaime had ever been abused or physically neglected or that they were in imminent peril of any nature. Indeed, Zoss was fully aware that the juvenile court in Maryland, after a plenary investigation by SMDSS, had refused to remove Justin from the physical custody of his mother. And, SMDSS's assertion that Jaime had been neglected evidently had so little merit that the court did not even expressly address it. Zoss knew, or reasonably should have known, that following the initial shelter care hearing, SMDSS's own expert witness examined Justin and concluded that to take him away from his mother would actually result in a net *detriment*, not benefit, to Justin.

Patricia Jackson's unrefuted affidavit provided that, as guardian *ad litem*, she was informed by Carole Coursey, counsel for SMDSS, that "[SMDSS] had attempted to gain the cooperation of the California authorities . . . to conduct a home visit of the Martin children for three weeks without success. . . . Ms. Coursey described her client as telling LADSS 'to take the children.'" J.A. 111. Thus, another reasonable inference is, as Martin asserted in her motion to dismiss the CINA petition, that Zoss "intended solely to manipulate and coerce the Los Angeles County Department of Children's Services into assigning a higher priority to the request." J.A. 119.

About the only substantial fact highlighted by defense counsel to show that Zoss's conduct was objectively reasonable is that Martin moved from Maryland to California while the final hearing on the CINA petition was still pending. This is uncontested, but I fail to see how it helps Zoss. Zoss nowhere says that the move motivated her actions, nor explains how the move created circumstances requiring removal of the children. To the extent Zoss's attorney offers this fact

post hoc to suggest that Martin had illegally fled the jurisdiction, Martin has created an issue of fact in this respect. It is undisputed that Martin informed SMDSS of her intention to move more than two months prior to the hearing date. After arriving in California, Martin obtained a California identification card, enrolled Justin in school, and notified SMDSS of her new address, which hardly suggests that she was ducking the authorities. And, I find nothing to suggest that SMDSS told Martin she was required to stay in Maryland. Additionally, at the very least, even if Martin was trying to distance her family from SMDSS, SMDSS had no authority to force Martin to keep the younger child Jaime, for whom shelter care was denied, in Maryland.

In sum, I cannot imagine more arbitrary conduct. Zoss has not pointed to a single fact that justifies the extra-judicial removal of Martin's children. I therefore have no difficulty finding that such conduct is of a kind that shocks the conscience and that Martin has sufficiently alleged a violation of her rights guaranteed by the substantive component of the Due Process Clause of the Fourteenth Amendment.

### B.  *Clearly Established Law*

The next question is "whether the established contours of the [Fourteenth] Amendment were sufficiently clear [in October 1997] to make it plain to reasonable [officials] that their actions under these particular circumstances violated [Martin's] rights." *Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997) (en banc). In determining whether the right in question was clearly established, we must define "the right allegedly violated . . . at the appropriate level of specificity." *Wilson*, 526 U.S. at 615. This does not mean that "the exact conduct at issue [must] . . . have been held unlawful for the law governing an officer's actions to be clearly established." *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001). Rather, our analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Id.* at 362-63 (internal quotation marks omitted). The right must be defined "in such a way as to provide notice to a reasonable person in the official's position that his conduct violated the identified right." *Id.* at 363.

In light of our caselaw in October 1997, and that of a number of other jurisdictions, I cannot accept the notion that Zoss could have

reasonably believed her actions were lawful. We have clearly stated, on more than one occasion, that a social worker can remove a child from the parent's physical custody without getting prior court approval only *when the caseworker is acting in an alleged emergency situation. See Weller*, 901 F.2d at 391-92 (reviewing a removal effected by a caseworker who was provided evidence of child abuse); *Chambliss*, 112 F.3d at 376-37 (same). Although our decisions have not affirmatively stated that substantive due process forbids the removal of a child from his parents *without* prior judicial approval in a non-emergency and where there is no evidence of serious danger, that principle is clear from our statements in *Weller* and *Chambliss*. And, although we have not precisely determined the outer contours of what constitutes an emergency, our recognition that a pre-hearing removal is proper when there is *some* evidence of child abuse at a minimum makes clear that a caseworker can assume custody of a child without court approval only if the caseworker has *some* articulable basis for doing so. Here, we have been pointed to nothing that could be considered a justifiable basis.

Moreover, I believe that a number of other precedents made it clear in October 1997 that Zoss's conduct was impermissible under the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Croft*, 103 F.3d at 1126; *Manzano v. South Dakota Dep't of Soc. Servs.*, 60 F.3d 505, 511 (8th Cir. 1995); *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir. 1991); *Hurlman*, 927 F.2d at 80.

Accordingly, I would reverse the district court as to Martin's claim that Zoss violated her fundamental right to physical custody of her children free from arbitrary state interference. I would return this particular claim to the district court for further proceedings. I respectfully dissent.